serviceman who came on the 15th, and that someone she could not remember came "a few days" later. Telephone Company records showed that one Struder came on the 15th and Galliot came on the 18th. A friend of plaintiff testified that he removed the cover of plaintiff's 'phone several times during this period, and that on the 17th a blue lead line was taped off, but on the 18th (after the 'phone had been repaired) the line was connected to its terminal. It is unclear from the testimony whether the line had been attached to its terminal on the 16th. The above incidents and the occurrences related in finding 7 are inadequate to prove that plaintiff's 'phone had been monitored, and certainly inadequate proof that any monitoring was done by defendant.

■ A friend of plaintiff's had several conversations with General Wray concerning plaintiff's desire to discuss the circumstances of her resignation. General Wray contacted the Air Force Judge Advocate General, who informed him that he could not have such a discussion with plaintiff unless a representative of the Department of Justice was present, but that if such a representative was present, he was free to talk to anyone. Nothing was said to him about being a witness. General Wray testified that he knew of no activity on either side that could possibly prevent him from being a competent, available witness. It should be made clear to General Wray that, if he wishes, he can talk to plaintiff or her counsel as a possible or potential witness, in the absence of a representative of the Department of Justice, without violating the so-called "Hebert Law," 18 U.S.C. §§ 203, 205, 206, 283 (1964).

Since it is found that defendant has complied with the duty to produce set forth in paragraph (b) of the court's Order of June 6, 1966, it is now incumbent upon plaintiff, under paragraph (d) of the same Order, (1) to proceed to trial on her claim that her resignation was induced by coercion, duress, or undue influence, or (2) to allege a procedural error in the grievance proceedings, and file a dispositive motion based on such alleged error. In light of the fact that this case has been pending here for seven and a half years, plaintiff may now have no more than 45 days in which to move for trial or to file such a dispositive motion. There should be no further delay.

Mary Catherine **WILLETT**

v.

The **UNITED STATES.**

Joseph William and Mary Grace **WILLETT**

v.

The **UNITED STATES.**

Robert E. and Anne T. **WILLETT**

v.

The **UNITED STATES.**

Charles D. **WILLETT**

v.

The **UNITED STATES.**

Paul A. and Elizabeth H. **WILLETT**

v.

The **UNITED STATES.**

Nos. 83–64 to 87–64.

United States Court of Claims.

Feb. 14, 1969.

COLLINS, SKELTON and NICHOLS, Judges.

OPINION

COWEN, Chief Judge.*

These five cases, having identical factual and legal questions, involve plaintiffs' claims for refunds for income taxes illegally collected. The plaintiffs are all brothers and sisters who, as partners in the Willett Brokerage Company, engaged for a period of time prior to 1947 in the business of selling warehouse receipts for barrels of whiskey they owned. In 1947, the partners caused the Wildwood Corporation to be created under Kentucky law, and transferred substantially all the assets of the brokerage company in return for stock in the corporation. Within a short time after the formation of Wildwood, the plaintiffs negotiated a sale of their stock in Wildwood, and reported on each of their respective returns for 1947 the income received as capital gains. The District Director of Internal Revenue for the District of Kentucky at Louisville (and for the District of Virginia at Richmond in the case of one plaintiff) disallowed capital gains treatment on the sale of the Wildwood stock. This was based on the determination that Wildwood was merely a "conduit" through which the partners transferred their whiskey inventory to the purchasers. In addition, the Revenue Service treated the sale of certain warehouse receipts as having been made by the brokerage company, and not by Wildwood, as claimed. Accordingly, the individual plaintiffs were assessed deficiencies in the amount of their respective shares of the profits from the sale of these receipts. Each plaintiff paid his deficiency (see finding 3 for the exact amounts involved), and then filed timely claims for refund, which were all denied. Suit in this court followed. Stipulated as part of the record

Louis Lusky, New York City, for plaintiffs, James E. Fahey, Louisville, Ky., attorney of record. David W. Gray, Louisville, Ky., and Robert E. Willett, Bardstown, Ky., of counsel.

Richard J. Boyle, with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller and Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, JONES, Senior Judge, LARAMORE, DURFEE,

---

* Although we have disagreed with the result he reached, the court acknowledges the assistance it has received from the report of Commissioner Roald A. Hogenson. We have adopted most of his findings of fact.

in this case was the transcript of testimony in a case in the Tax Court in a related matter.[1] In addition, our trial commissioner heard additional testimony which was not before the Tax Court. On the basis of all the evidence before the court in these cases we find for the reasons set out in this opinion that plaintiffs are entitled to recover.

## I

The following is a summary of the facts, but we refer to the detailed findings of fact * * * for a complete statement.

Plaintiffs are "second generation" Willetts, the children of Lambert Willett, who with his brothers and his wife, Mary T. Willett, founded the Willett Distilling Corporation in 1936. The Distilling corporation was and is in the business of operating a whiskey distillery and a bonded warehouse in Bardstown, Kentucky. However, until 1947, the Distilling corporation did not have its own bottling plant, so that all of its whiskey was sold in bulk. Some of plaintiffs owned stock in the Distilling corporation, and some did not.

Between December 1943 and May 2, 1946, plaintiffs as partners in the Willett Brokerage Company and its predecessor partnership, acquired by purchase from the Distilling corporation warehouse receipts for whiskey distilled by the corporation. Plaintiffs carried on a wholesale whiskey business in partnership form, selling warehouse receipts the partnership had acquired from the Distilling corporation. During most of the life of the Willett Brokerage Company (the partnership), the Emergency Price Control Act, approved January 30, 1942, 56 Stat. 23, was in effect. During that period, the brokerage bought whiskey warehouse receipts from the Distilling corporation at the regulated price, so there was no problem from the Distilling corporation's viewpoint about what was

a fair arms' length price for sales to the brokerage company. However, in early 1946 the status of price controls on whiskey was in doubt, with rumors circulating in the industry that the controls would be lifted in the near future. In fact, the Office of Price Administration was empowered to decontrol whiskey in July 1946, and did so, effective October 24, 1946. The plaintiffs made a decision that they would no longer make any purchases from the distillery after May 1946, because dealing with the distillery at arms' length once price controls were in doubt became a problem, especially in view of the fact that some of plaintiffs did not own stock in the distillery, and some of the stockholders of the Distilling corporation were not partners in the brokerage company.

Thus, after May 1946, the partners were left in possession of a considerable stock of whiskey. With the impending removal of price controls, it was expected that the whiskey would substantially appreciate in value due to the severe shortage of aged whiskey available at that time. So the partners began to consider what they should do with their inventory. Inquiries were made by some of the plaintiffs whether the partnership could receive capital gains treatment if it chose to sell its assets. The plaintiffs' tax attorney in the fall of 1946 assured them that if the partnership interests were sold, the profit would be a capital gain; that opinion was repeated by the attorney in early 1947. On the basis of such advice from counsel, the Willetts considered the sale of their interests in the business.

On the other hand, the partners in late 1946 also were contemplating the incorporation of their partnership for the purpose of carrying on a "case goods" business, that is, bottling their inventory of whiskey under the Willett label, and selling the bottled liquor. That course of action would dovetail with another de-

---

1. Willett v. Comm'r, T.C. Memo. 1957–189, 16 T.C.M. 840 (1957), supp. opinion, T.C. Memo. 1958–20, 17 T.C.M. 93 (1958), aff'd 277 F.2d 586 (6th Cir. 1960), cert. denied, 364 U.S. 914, 81 S.Ct. 276, 5 L.Ed.2d 226 (1960).

velopment which one of the Willett enterprises had begun in January 1946. In that month, the officers and directors of the Distilling corporation decided to construct a bottling plant at the corporation's premises in Bardstown. This plant, which was begun in September 1946 and was to be completed in the fall of 1947, was designed to bottle whiskey the distillery produced. The bottling plant would not only save bottling costs, but would also allow the corporation to show on the label that the whiskey was bottled at the distillery, a showing which is important to the success of the whiskey business.

The oldest whiskey owned by the Distilling corporation had been distilled in May 1946, and there was no demand for new whiskey in bottles. Because of market conditions, there was no known source of mature whiskey for bottling at the Distilling corporation plant other than the bulk inventory owned by the partnership, which consisted of about 3,000 barrels of bulk whiskey. If the bottling plant was not to stand idle until the distillery could produce enough whiskey to bottle, the partnership whiskey was the logical choice to become the first Willett brand case goods bottled by the new plant. For these reasons, throughout the latter part of 1946 and the early part of 1947, the partners began to consider, among themselves, the incorporation of the business and the conduct of a case goods business by having their whiskey bottled at the new bottling plant. The Willetts were advised by their attorneys that if a case goods business emphasizing the Willett brand name was to be conducted, it would be best to carry on the business in corporate form. The corporate form was considered very desirable for a number of reasons apart from the fact that the excess profits tax had been repealed. The corporate form of ownership would provide more efficient management of the company affairs, because the partners resided in widely scattered locations; the second generation of Willetts had produced a

rapidly growing third generation, and the corporate form would provide greater ease in estate planning. Moreover, it was felt that operation of the business by a corporation would facilitate dealings with financiers and would insulate the partners from personal liabilities for tort actions arising out of the bottling and marketing of consumer items.

During the fall of 1946 and continuing throughout the early part of 1947, the partnership received several inquiries regarding the purchase of the whiskey inventory or the sale of the partnership business, but there were no definitive offers or negotiations.

Sometime prior to June 1947, the partners decided to engage in the case goods business and to organize a corporation for that purpose. Therefore, early in June 1947, they instructed their attorneys to organize a corporation to succeed the partnership and to conduct a case goods business, as distinguished from the sale of warehouse receipts for bulk whiskey. Among the compelling reasons for this decision was the desire of the individual partners who would become stockholders to acquire property they could give to their children. To meet this problem, their attorney proposed that the corporation should, in addition to the issuance of common stock, issue preferred stock of a fixed value which could be redeemed to provide cash for such gifts. In anticipation of the completion of the bottling plant, the articles of incorporation of the Wildwood Corporation were filed on July 30, 1947, and on July 31, 1947, the assets and liabilities of the partnership were transferred to Wildwood in exchange for stock of that corporation. The assets transferred included substantially all of the whiskey inventory, except for a small amount of bulk whiskey retained to fulfill a commitment previously made by the partnership to a Chicago dealer. The partners also retained 200 cases of whiskey, which they felt might be needed to fulfill other short-term commitments that had been overlooked or, in the absence

of such commitments, would be kept for their personal use. The partnership also retained notes receivable, payable to the partners individually, as well as about $40,000 in cash. Ten thousand dollars in cash was transferred to Wildwood, the partners having decided that this would be sufficient for the operating needs of the corporation.

After it was incorporated, Wildwood itself made preparations to enter actively into the case goods business. A corporate seal was adopted. Corporate books and records were set up, and a wholesaler's permit was obtained from the Internal Revenue Service. Advertisements were taken in the local papers to promote the new "Willett" brand name. Tentative arrangements were made with a whiskey broker for Wildwood. Approval from the Internal Revenue Service was sought for "Willett" brand labels, which would show that the whiskey was distilled and bottled at the same site by the Distilling corporation. The Distilling corporation purchased about 3,000 cases of glass bottles and ordered sealing caps. Since the only whiskey available to immediately fill these bottles was the whiskey held by Wildwood, it is apparent that the Distilling corporation's purchase was with a view to bottling the Wildwood whiskey specifically. The insurance policies of the partnership were endorsed to substitute the Wildwood Corporation for the partnership as the insured party.

Early in July, Mr. Fred Metzger, a whiskey broker from Newark, New Jersey, got in touch with the Vice President and Treasurer of Joseph E. Seagram, and advised him that the brokerage company wished to sell the partnership business with all the whiskey it owned. Seagram did not indicate an interest in acquiring the whiskey, so Metzger went on a vacation and negotiations were not resumed until August 4, 1947. At that time, Metzger was informed by Thompson Willett, a family member who served as a "managing" partner of the partnership, that the corporation had

been created to take over the partnership business, that the whiskey inventory had been transferred to the corporation, and that any sale made to Metzger's clients would have to be in the form of the sale of the corporate stock—all subject to the approval of the stockholders and subject to their being assured that the sale would qualify for capital gains treatment.

On August 4, 1947, Metzger told Thompson Willett that he had a prospective unnamed purchaser who would be willing to purchase the capital stock of Wildwood. After discussing the matter among themselves, the stockholders agreed that the details of Metzger's overture should be ascertained. The stockholders also consulted with their tax attorney and received his assurance that the sale of the stock would be accorded capital gains treatment. In the meantime, Wildwood went forward with its preparations to engage in the case goods business. On August 6, 1947, tentative arrangements were made to supply case goods to an association of retail liquor dealers in Chicago. Discussions were also had with a whiskey broker in Chicago concerning his brokering of the Wildwood whiskey. Arrangements were made with a wholesale whiskey company to be exclusive distributors of the case goods in Kentucky.

On August 11, 1947, Metzger and Thompson Willett made arrangements by telephone for a meeting in New York on August 19, 1947, to further discuss Metzger's offer.

On the night of August 14, 1947, a fire in the Distilling corporation plant badly damaged the distillery, and it was soon evident that the damage would not be covered by insurance. The occurrence of this disaster is a crucial factor in this case. After the fire, the partners all realized that their proposed case goods business was seriously threatened. In order to promote and sell the whiskey under the Willett brand name, Wildwood needed an assured supply of uniform whiskey. With the distillery out of com-

mission, such a supply would not be available, because there is a lapse between the time whiskey is produced and the time it can be sold. It was realized that when Wildwood's inventory was exhausted, the corporation would have to wait a year or more before Willett's whiskey would be available for bottling. It was also felt that during such a hiatus, any brand identification Wildwood would have achieved would likely be lost as customers turned to other brands. Thus, after the fire, the future of the case goods business which theretofore had looked fair indeed was seriously in doubt. The Distilling corporation was the heart of the Willett enterprises, and without it, it was obvious that the case goods business plans for the near future would be of very short duration.

Under the circumstances described above, representatives of Wildwood attended the New York meeting with Metzger, where they learned for the first time that Seagram was the prospective purchaser. After a tentative agreement had been made for the purchase of the stock by Seagram, a temporary impasse over the terms of the sale interrupted negotiations. However, on August 20, 1947, a tentative agreement for the sale of the Wildwood stock was made.

The decision to sell was not made until after extensive conferences among the stockholders of Wildwood. Some of them were reluctant to abandon the development of the case goods business or the sale of whiskey under the Willett label. In particular, this was the position of those stockholders who owned no stock in the Distilling corporation and who realized that the sale would require them to abandon the liquor business. Thompson Willett was not pleased with the sale, because he had hoped that the purchaser would be one that would benefit the Distilling corporation by utilizing the new bottling facilities. Nevertheless, on September 26, 1947, a decision was made to sell the stock of Wildwood Corporation, and the transaction was consummated on October 23, 1947.

We have adopted the trial commissioner's conclusion to the extent that he decided Wildwood was not incorporated to serve as a mere conduit for the sale of the whiskey warehouse receipts by the partnership. It is absolutely clear from the record before us that Wildwood was in no sense a sham corporation that was created to provide the vehicle for a tax evasion scheme. On the contrary, it is unchallenged that it was the successor to a partnership which had operated profitably for two years. Moreover, Wildwood acquired scarce and valuable assets which, with the prevailing market conditions, provided a high potential for the successful operation of the case goods business in the future.

In the related case in which it found that Wildwood was a mere conduit, the Tax Court determined in effect that Wildwood was created in furtherance of a pre-arranged plan to sell the whiskey inventory to Seagram and the West Shore Wine and Liquor Company, which acquired 22.7 percent of the stock of Wildwood. The additional and undisputed evidence presented in this court persuades us to find directly to the contrary. In his testimony in these cases, Mr. Frederick J. Lind, Vice President and General Counsel of Seagram, made it very plain that Seagram had absolutely nothing to do with the incorporation of Wildwood. The proposal to incorporate the business had been under consideration since the fall of 1946, and a definite decision to organize Wildwood was made early in June 1947. It was not until August 4, 1947, that Metzger, who negotiated the sale with Seagram, knew that the Wildwood Corporation had been created and that was the first date on which Seagram's representative expressed interest in the purchase of the whiskey. Nor did the corporate form in any way facilitate the sale of Wildwood and its assets. In the fall of 1946, the Willetts had been informed by counsel that the sale of their interest in the partnership would be accorded capital gains treatment, so that adoption of the cor-

porate form for doing business was not a prerequisite for advantageous tax treatment. Seagram was not interested in how the whiskey was owned. Indeed its only concern about the ownership was that for tax reasons it would be unprofitable for Seagram to buy as much as 80 percent of the Wildwood stock. In view of the tax problem, Seagram was therefore compelled to see one of its competitors acquire more than 20 percent of the Wildwood stock and of the whiskey inventory.

When the record as a whole is viewed in the light of the events that have occurred, what we have left is the picture of a corporation which was formed for the purpose of carrying on a case goods business but which, because of an unforeseen disaster, conducted only a limited amount of business. The reasons for incorporating were the usual and normal reasons which induce businessmen to adopt the corporate form. The action was taken on the advice of counsel and the testimony as to the numerous reasons for the creation of Wildwood is consistent and plausible. We are not persuaded that it is unreliable.

■ The greater weight of the evidence shows that the activities of the Willetts, at least until the fire occurred, were more indicative of an intention to engage in the case goods business than to sell the inventory. We hold, therefore, that these activities meet the test of Moline Properties, Inc. v. Comm'r of Internal Revenue, 319 U.S. 436, 438–439, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), and prove that Wildwood was organized with an intent in good faith to conduct the case goods business and that the new corporation had begun the "equivalent of business activity."

Since it is an established fact that Wildwood was not created to serve as a conduit for the transfer of all inventory, we think undue weight was given by the trial commissioner to the fact that at various times prior to incorporation of Wildwood, the members of the partnership had seriously considered the sale of their partnership interest in the whiskey, provided that their gain on the sale would be treated as a long-term gain on the sale of capital assets. The fact that the Willetts did not discourage inquiries about the purchase of their interests in the partnership during the period they were preparing to incorporate and begin the case goods business seems to us clearly outweighed by the reasons for incorporating and by the actual steps which were taken to begin the case goods business. It seems highly unrealistic to maintain that prudent businessmen must never consider abandoning a course once considered, even if a change appears to be more beneficial than the retention of a former mode of doing business. At the very least, businessmen in such circumstances should be allowed to consider the alternatives, even during the time they are fairly certain they have chosen a course of action. We know that in a somewhat related area of tax law "primary intent" does not mean that the intent must be to the absolute exclusion of every other thought or course of action. See Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); R. A. Bernstein, "Primarily for Sale": A Semantic Snare, 20 Stan.L.Rev. 1093 (1968); S. S. Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv. L.Rev. 985 (1956). We think that the record shows that all that was done prior to the fire indicated an intent to conduct a case goods business in corporate form, and that but for the fire, that intention would reasonably have been expected to be carried to fruition.

If Wildwood was not created to serve as a mere conduit for the sale of the whiskey warehouse receipts—as we have found—the only reasonable alternative left by the record before us is to conclude that the corporation was organized for the purpose and with the intention, in good faith, of engaging in the case goods business. In the light of all the evidence, we find no basis for inferring that rational businessmen, regularly advised by their attorneys, would spend the time

and expense of incorporating and preparing to undertake the case goods business merely to gain a tax advantage in the sale of their inventory, when the same tax advantage would have been available to them through the sale of their interests in the partnership. On the contrary, we find that the events and transactions which led to the creation of Wildwood resulted from a business decision by the Willetts, and particularly the younger partners, to expand the family enterprises and to strike out in a new direction at an opportune time. Their hopes and expectations were disrupted by the disastrous fire, which caused them to abandon, with much reluctance, their plans to go forward with the case goods business.

Finally, we agree with Chief Judge Weick's dissenting opinion in Willett v. Comm'r, *supra,* that the retention by the partners of a large amount of liquid assets is of little significance in this case. A complete explanation of the reasons why these assets were not transferred to Wildwood is contained in finding 24. There is no showing that the operating capital of $10,000 was insufficient to begin the business and the controlling factor in the transaction is that the partnership transferred 99 percent of the whiskey to the Wildwood Corporation. This was the asset which was most essential and important to the operation of the case goods business in which the new corporation was to engage.

## II

■ Plaintiffs have also established that Wildwood "[did] some business in the ordinary meaning." National Investors Corp. v. Hoey, 144 F.2d 466, 468 (2d Cir. 1944). On August 6, 1947, Wildwood sold 50 barrels of whiskey to R. L. Buse Company, and again on August 11, 1947, the corporation sold 10 barrels of whiskey to the same whiskey broker. We do not agree with the trial commissioner's conclusion that the sales of the warehouse receipts in these two instances were negotiated prior to the formation of Wildwood, because we find

that the greater weight of the evidence is to the contrary. Bringwald, Inc. v. United States, 334 F.2d 639, 167 Ct.Cl. 341 (1964); Miller v. United States, 339 F.2d 661, 168 Ct.Cl. 498 (1964). The commissioner's determination in this regard was apparently based on the testimony of Thompson Willett—testimony given 20 years after these transactions—that he could not recall when he was contacted by the Buse Company. For this reason, he could not state specifically whether it was a day, a week, or two weeks before the dates of the invoices, but he made it clear that he would defer to any documentary records. It seems clear from these documentary records, plus other corroborating circumstances, that the sales were transactions involving the assets of the new corporation and should be attributed to it. The invoices were issued on paper which had the legend, "Wildwood Corporation, Successor to" typed over the printed heading "Willett Brokerage Company." The documents also provided that the seller assumed the storage charges and taxes to the respective dates of sale, which were the dates of the invoices. The goods were already on hand and there is no sensible reason why the seller would have delayed the consummation of the sales for a period of two weeks and thereby reduced its profit by the payment of additional storage charges and taxes. Moreover, there were two sales, and if the deals had already been made final before July 31, 1947, there would have been no necessity for the issuance of two separate invoices, almost a week apart. Transactions consummated two weeks prior thereto would, in all probability, have been handled by one invoice, since all of the whiskey was of the same quality and came from the same warehouse.

Further, we have found (finding 24) that the partnership retained four barrels of whiskey to fulfill a preexisting commitment to an association of liquor dealers in Chicago, plus 200 cases of whiskey, which the partners felt should be retained to fulfill any other short-term commitment which they may have

overlooked, or, in the absence of such commitments, for their personal use. All of this demonstrates that the partners certainly attempted to retain enough stock on hand to fulfill any commitments or sales previously negotiated by the partnership, and there is nothing in the record to indicate that they would not have done the same with respect to any sales to the Buse Company by the partnership. Accordingly, we have found that the sale of the warehouse receipts to Buse Company were sales made by Wildwood and not by the partnership.

### III

In summary, we hold that plaintiffs are entitled to recover on the ground that they are entitled to treat the gain from the sale of their Wildwood stock as long-term capital gain pursuant to Section 117 of the Internal Revenue Code of 1939. Plaintiffs are also entitled to recover on the ground that the sales by the warehouse receipts to the Buse Company were sales by the Wildwood Corporation and did not result in income to the Willett Brokerage Company. The cases are remanded to the trial commissioner for determination of the amount for which judgment is to be entered under Rule 47(c).

LARAMORE, Judge (dissenting):

I respectfully dissent for the following reasons: On my analysis of the proof presented by plaintiffs, I cannot conclude that plaintiffs have fulfilled their burden to prove that the corporation was formed to operate the case goods business, or that the corporation engaged in sufficient independent activities to establish that it was an active business in the ordinary meaning of that term.

Accordingly, I would conclude that this transaction was a sale of inventory and not taxable as capital gains. I would deny plaintiffs relief and dismiss the petitions.

NICHOLS, Judge (dissenting):

Plaintiffs here seek to "make a new case", that is, they wish to obtain for the same transaction different tax consequences than were meted out by the Tax Court, and on appeal, by the Sixth Circuit, to other copartners who sought judicial review by different route. Willett v. Commissioner, 16 CCH Tax Ct. Mem. 840 (1957), supp. opinion, 17 CCH Tax Ct. Mem. 93 (1958), aff'd, 277 F.2d 586 (6th Cir.), cert. denied, 364 U.S. 914, 81 S.Ct. 276, 5 L.Ed.2d 226 (1960). Naturally, those decisions are entitled to a high degree of respect as *stare decisis* here except insofar as new evidence destroys some of their factual underpinning, and it is on this that attention must focus. Our commissioner said this did occur inasmuch as he could not find, as the Tax Court did, that Wildwood Corporation was used as a mere conduit to transfer whiskey warehouse receipts from the partnership to Seagram's, and that the formation of Wildwood, the transfer of the warehouse receipts to it, and the sale of its stock to Seagram's were but steps in a single transaction. However, he reached the same result via his findings that Wildwood did not carry on a business "in the ordinary meaning" and was formed with no *bona fide* intention that it do so. Our majority take issue with this and hold that such an intent did exist, and moreover Wildwood did do some business, they say. I agree with our commissioner, and think it my duty to publish the reasons why, particularly since the commissioner submits no recommended opinion to speak for itself.

The issue is whether gains from the stock sale are includable as gross income under Sec. 22, I.R.C. of 1939 or are taxable only as a capital gains in view of the definition of a Capital Asset in Sec. 117(a) (1) of such Code. To avoid encumbering the record with another lengthy recital of facts, I refer the reader to the majority opinion, to the Tax Court and Court of Appeals decisions, *cit supra*, and to our commissioner's findings, but from my search of the trial transcript I draw certain inferences which I would add to his findings, as below.

Willett Distilling Company having been organized only in 1936, had ap-

parently no history of marketing under its own label, and sold its manufactured product, Kentucky Bourbon, normally in bulk, after proper aging, except for small lots. It was a closely held family corporation. In 1943 its stockholders embarked on a policy of buying from the corporation at wartime OPA ceiling prices warehouse receipts representing a major part of Distilling's stock of manufactured whiskey held in barrels for aging, or in bottles. They formed in the first instance a joint venture, later transformed into a partnership. They sold to some extent but had accumulated a total of 7,642 barrels by the end of price controls.

Whiskey ceases to age, legally and practically, when bottled. Normally, and evidently here, bulk whiskey is non-tax-paid, and kept in bond under close Government supervision. Whoever exercises his rights to withdraw, under a warehouse receipt, must be prepared to pay the Federal excise taxes (I.R.C. of 1954, § 5006(a) (1)) which at all times here relevant have greatly exceeded, as to any given quantity of whiskey, the non-tax-paid value thereof. Whiskey can be bottled in the warehouse, still under bond, but not below 100 proof, *i. e.*, not below 50% alcohol, except for export. (I.R.C. of 1954 § 5043(b)). The growing public taste for light, mild whiskeys must be satisfied by bottling whiskey that is already withdrawn and tax-paid. It was stipulated in a recent Customs case that over 90% of domestic distilled spirits are withdrawn at or above proof (50% alcohol) and over 90% of distilled spirits sold at retail are bottled below proof. The water to reduce the proof is added after withdrawal. Schieffelin & Co. v. United States, Cust.Ct., 294 F. Supp. 53, (Customs Bulletin, January 1, 1969). Thus it would seem to follow that the bottling, distributing, and marketing of domestic whiskey is an undertaking requiring financial resources, and was so admitted to be by the witness Thompson Willett in this case. (See below.)

Some of the bottled whiskey in the partnership inventory was stated to be tax-paid. I conclude that the part stated to have been bottled in bond and the major portion that was in barrels was not tax-paid.

The partners waited out the end of OPA price controls, and then started to dispose of their accumulation. When they formed the Wildwood Corporation, in August, 1947, they turned over to it nearly all the large remaining stock they had acquired under OPA ceilings and still had. Whatever feelers they may have received from agent Metzger on behalf of Seagram, it is now established that they did not form the corporation to function as a conduit to Seagram. It seems obvious, however, that their intent, as they allege, to use the corporation to carry on a case goods business, is not completely established by this.

If they had intended the corporation to play the role of holding warehouse receipts, and no other, and it was so employed up to the time of the Seagram sale, it would be clear to me that sale of the corporate stocks would be so indistinguishable from sale of the receipts, for all practical purposes, that legally we would have to hold them to be the same. The corporation would have had no plant, have performed no manufacturing or selling operation, had no consumer acceptance, and no goodwill or going concern value. It would have consisted of a bunch of warehouse receipts and no more, and whether one sold them directly or by sale of stock would have been the kind of paper difference the tax laws disregard. The corporation would be actually used in a step transaction, whatever the intent of its organizers, the transaction as a whole being a sale of warehouse receipts.

The proposed case goods business would have been a different kettle of fish entirely, if once set to boil. It would have required farflung operations and licenses, state and Federal, an advertising program to obtain consumer acceptance of the brand, working capital to

pay the taxes and get the whiskey out of warehouse and into bottles. Once the brand was known, there would have been goodwill values. Even if one buying stock in such a business did so to get the whiskey, the seller would have had indeed a formidable case that he was selling a going business, not an inventory alone.

The difficulty here is that, as I see it, the Willett family at the time of sale to Seagram were still hesitating whether to enter the case goods business or not. Mr. Willett testified that the corporation might have continued to hold bulk whiskey "as a speculation"; that they might use the corporation as "a holding company" (R 99). That they were immediately embarking on the program is not proved by the Buse sale: that was a sale of warehouse receipts for bulk whiskey, not case goods. It was just what they had been doing all along. The $10,000 cash paid into the corporation would seem a mere pittance compared to what was wanted for the case goods business. Mr. Willett testified there was no need then for the whole $39,000 of cash the partnership had because:

> The Wildwood didn't need it, it had access to money and whatever it needed. (R 116).

He did not say $10,000 was itself enough. As already noted, he said:

> It takes money to finance a case goods program, tax, wait for your money to get back from your customers and so forth. (R 143).

The fire was an important factor in the decision to give up the case goods program because the loss was not fully covered by insurance (R 143) and thus the restoration of the distillery and the case goods program would have competed for available funds.

It is therefore clear the corporation was not financed for an immediate start on the case goods program. The things that were done, securing permits, licenses, Government approval of labels, running newspaper advertising, etc., did not involve large expenditures, and constituted mere preliminary staff work. The Distilling Company bought the bottles, not Wildwood, and ultimately it used them.

As a matter of semantics, it seems to me if an intent to do a thing exists, that means the decision to do it has been made and alternatives have been rejected. That was not the situation here. If the sale to Seagram was the preferred alternative only after the fire, it was an open alternative before, and a sale to someone had been considered for a long time. The meeting with Seagram's people in New York to discuss that sale took place after the fire, but had been arranged before it. (R 138). Thus at the time of the transaction the Wildwood Corporation was not engaged in actually carrying on a case goods business and was not truly a "going concern", nor had a valid intent emerged to carry on a business or become a going concern. What was to be made of the corporation was uncertain until the sale and was decided by the sale.

I do not agree with the implications of our commissioner's Finding 51 that sale was all along the preferred alternative and would modify that finding. I agree with the Chief Judge in his amended Finding 13, but would add "The corporation was also seen as useful in case the stockholders should decide to use it as a holding company, as they had the partnership." I would add to the end of the first paragraph of Finding 15: "Unless they decided otherwise." I do not agree that Finding 16 should be amended. Without the first sentence it is as our commissioner submitted it. The nature of my disagreement with the "Ultimate Findings" 50 and f.f., does not need to be elaborated.

In analysing a step transaction, what is important is not the intent with which a corporation is formed but how it is used. We held this, in effect, in Simon v. United States, 402 F.2d 272, 185 Ct. Cl. 291 (decided October 18, 1968). Our commissioner there, in his proposed opinion, held it was conclusive that a corporation, the alleged transferee, had

not been formed to effectuate the alleged reorganization. We dropped that part of the opinion because we thought such a reorganization could make use of an existing corporation which had been formed for other purposes. We reached the same result on other grounds. So here. Whatever the intent of the Willetts in forming Wildwood, so long as it continued a mere inert holding company the Tax Court view of the passage of the warehouse receipts through it to Seagram as a step transaction remains essentially valid.

**PAUL HARDEMAN, INC.**

v.

**The UNITED STATES.**

No. 273-67.

United States Court of Claims.

Feb. 14, 1969.