By the Review Panel :
By H. Res. 1110 of the 90th Con-
gress, the United States House of Representatives on May 21, 1968, referred H.R. 9752, a bill for the relief of Douglas E. Kennedy[1] and Alvin B.[2] Burt, Junior, to the Chief Commissioner of the United States Court of Claims, pursuant to 28 U.S.C. § 1492 (1964) and 28 U.S.C. § 2509 (1965-8, Supp. IV). The Chief Commissioner referred the case to Commissioner Louis Spector for proceedings in accordance with the rules, and designated a review panel to consider the trial commissioner’s report on the merits of claimants’ right to receive compensation for injuries sustained on May 6,1965 in Santo Domingo, Dominican Republic, when they were wounded by gunfire from United States Marines while on assignment for their employer, the Miami Herald, covering the civil insurrection then occurring in that country.
The resolution here involved is unique in its special directions as to the standards by which claimants’ demands are to be evaluated. Thus, in addition to application of the statutory criteria of “* * * whether the demand is a legal or equitable claim or a gratuity, * * *” [28 U.S.C. § 2509(c)] H. Res. 1110 prescribes that:
In the consideration of H.R. 9752 the Chief Commissioner shall consider * * * negligence or other fault of the U.S. and/or equity and good conscience and any other matter within the court’s jurisdiction. [Emphasis added.]
The quoted language was added to the resolution, as introduced and later reported favorably by the Judiciary Committee, by a floor amendment offered without accompanying explanation. 114 Cong. Rec., Part 11, p. 14212.
On May 18, 1971, following a trial and briefing by the parties, Commissioner Spector issued an opinion accompanied by 112 pages of findings. He concluded that in “good conscience” the claimants were entitled to recompense in the amount of $100,000 for Mr. Kennedy and $75,000 for Mr. Burt.
*901 On July 9, 1971, after noting its intention to except to the commissioner’s report, respondent moved to reopen proof in order to adduce the facts pertaining to claimant Kennedy’s then-current physical condition. The motion was allowed by the review panel’s order of August 6, 1971, reopening proof and remanding the cause to the trial commissioner for further proceedings. On November 10, 1971, Mr. Kennedy died from what medical records subsequently adduced by respondent revealed were causes unconnected with the injuries on which the present claim is predicated. On March 24,1972, the trial commissioner issued a supplemental opinion reaffirming all findings and recommendations previously rendered.
Though we hold that the claimants have neither a legal nor equitable claim within the meaning of 28 U.S.C. § 2509 (c), we agree with the trial commissioner that their demands are compensable (albeit in lesser amounts and for somewhat different reasons than he adopted) under the more liberal “good conscience” standard added specially to the resolution referring this entire matter here for evaluation.
We find ourselves unable to affirm several of the trial commissioner’s conclusions in addition to those dealing with the amounts of recompense properly due claimants, viz, that the Marines were negligent in shooting at the car occupied by claimants, that in traveling in the so-called rebel area of Santo Domingo claimants did not assume the risk of being shot at and, finally, that in failing to dismount from their automobile when challenged at the checkpoint or to otherwise identify themselves to the Marine sentry stationed there, claimants were not contributorily negligent in respect to the shooting that followed.
Despite our inability to endorse the foregoing conclusions, we are in general agreement with the trial commissioner’s comprehensive findings of evidentiary fact.[3] Therefore, while we specify in this opinion those facts that we deem essential to our recommendation, we append the trial commissioner’s *902 report as Appendix A for its in-depth presentation of background information and for such other matters as interested persons may care to peruse.
In April 1965, a civil upheaval occurred in the Dominican Eepublic in the form of an armed contest between two competing groups for control of that country’s government. On April 28 400 U.S. Marines were dispatched to Santo Domingo to protect American residents there and to safeguard the evacuation of many of them.
By May 5 the United States Army and Marine forces assigned to the area had increased to approximately 16,000 and had incurred 10 fatalities and 67 other casualties in performing the peace-keeping role that our Government had undertaken. The great increase in the military contingent’s size reflected the enlargement of its mission from that of merely safeguarding American residents to maintaining the integrity of a zone of neutrality that was established to separate the two contending local groups and was progressively increased in size. It was at one of the checkpoints established to control passage through 'the neutral zone that the tragedy underlying the present reference occurred.
Happening, as it did, in the wake of the ill-fated United States venture in Cuba, the American involvement in the Dominican situation was the subject of considerable public and political debate and controversy. In these circumstances the record reflects, and the trial commissioner found, that the official policy of the United States Government was that of encouraging broad press coverage and investigation in order to promote the fullest possible public exposition of the realities of the situation to which it had committed its military might. Such a policy also tended to effectively dispel any adverse inferences of news suppression or concealment on the part of the United States.
In furtherance of the above policy, the United States Navy supplied press representatives with in-bound air transportation and lent its services and facilities to their working needs after their arrival in Santo Domingo.
Claimants arrived in Santo Domingo by Navy plane from Puerto Eico on May 4 and proceeded to a downtown hotel, Embajador, where the transient members of the press and visiting United States diplomatic and military officials were *903 quartered. It was at this hotel that regular press briefings were held by United States officials and news bulletins released.
Although the two disputed factions had informally agreed to a cease-fire on April 30, gunfire, principally from rebel snipers, was still prevalent in the city on May 4 and 5 and the press corps, including claimants, was generally aware of that fact.
On May 5 claimants reconnoitered the city. Mr. Kennedy, the photographer, concentrated on taking pictures of newsworthy items while Mr. Burt, the writer, interviewed various Dominican insurgents and Marine personnel in order to gather material for articles and dispatches. Among the Marines that Mr. Burt visited with that afternoon at checkpoint Alpha was Corporal Gandia, who the following day was to be the sentry who challenged claimants’ passage at the same checkpoint immediately prior to the tragic shooting that ensued.
By prior invitation, the claimants went to the United States Embassy on the morning of May 6, where they met with Ambassador Bennett and reviewed his assessment of the prevailing situation and its probable aftermath. Claimants told him of their prior day’s visit to the rebel zone and of their desire to return there to obtain more pictures and material for news dispatches. Thus, they asked the Ambassador whether they should anticipate any difficulty, en route to and from the rebel zone, in gaining clearance through the checkpoints controlled by the Military. He replied that they should have no clearance problems since they 'both had proper Defense Department credentials. Since the American Military Commander, General Palmer, was in the embassy at the time, Ambassador Bennett referred claimants’ question concerning checkpoint clearance to him and he confirmed the Ambassador’s advice, stating that orders had been issued to the effect that all accredited press representatives were to be permitted checkpoint ingress and egress upon presentation of their credentials.
In sum, the attitude of both the Ambassador and the Military Commander reflected the United States Government’s freedom of information policy under which no limitations were placed on the freedom of bona fide press representatives *904 to personally observe and freely investigate all aspects of the events then transpiring in Santo Domingo. In expressly confirming this latitude of movement for the press in their discussions with claimants, the United States officials said nothing that could be reasonably construed as either discounting the degree of personal risk involved for those exercising such mobility or implying that the United States would underwrite such consequences as might materialize from those risks. In fact, all concerned were well aware that the carrying of arms was still much in evidence in the city and the incidence of rebel sniper activity not infrequent.
After their discussion with the Ambassador and General Palmer, claimants left the embassy in a rented car with a Dominican driver and proceeded without incident through a vehicular checkpoint to George Washington Avenue, a waterfront, palm-lined boulevard where Mr. Kennedy was interested in photographing a ship that was burning nearby. After this had been done, they returned to their oar and continued along the avenue towards the George Washington Monument, an edifice similar to the one in Washington, D.C. As they approached the monument, they found the street obstructed by two burned automobiles placed there by the rebels to form a blockade. They stopped and got out of the car. While Mr. Kennedy was taking more pictures, Mr. Burt struck up a conversation with a Dominican Bed Cross worker and another national who were on the scene. Both were dressed in olive drab clothing and the latter was carrying a rifle. The Marine sentries stationed down the Avenue at Checkpoint Alpha, located at the intersection of the Avenue and Pasteur Street, were observing the meeting between claimants and the Dominicans. After some conversation, the Dominican Bed Cross worker directed Burt’s attention to a rifle-bearing sniper on the roof of a nearby building and recommended that claimants leave the area for their own safety. They thereupon returned to their hired car and drove off in the direction from which they had come. Thus, they were driving toward Checkpoint Alpha where Mr. Burt had talked at some length with the Marine personnel on duty the preceding afternoon. Alpha was a pedestrian, not a vehicular checkpoint. Vehicle passage was blocked by a tank and *905 armored vehicle parked nose-to-nose in order to form a blockade across the roadway.
The sentry detail was under the command of a Marine lieutenant. As claimants’ car moved slowly down the avenue toward the Marine blockade, the lieutenant-in-dharge ordered Corporal Gandia, a member of the sentry detail who was fluent in both Spanish and English, to move forward and halt the car before it reached the blockade. Gandia, accompanied by several rifle-bearing Dominican nationals, followed the order and the car complied with his hand signal to stop some 25-30 meters away from the blockade. Standing 10-20 feet from the car, the corporal, in both English and Spanish repeatedly called for the occupants to get out. On its windshield the otherwise unmarked car carried the word “PRENSA” (Press) lettered in tape some 5-7 inches in height. The weather was clear and sunny 'and whether because of glare or other reasons, the uncontradicted evidence is to the effect that in fact neither 'Corporal Gandia nor any other member of the Marine detail saw the “PRENSA” marking on the windshield. In any event, claimants neither got out of the car nor called out to identify themselves; this notwithstanding that Mr. Burt acknowledged that he recognized Corporal Gandia as one of the Marines with whom he had spent considerable time talking at the same checkpoint the day before. After several minutes of this apparent impasse, the Dominican driver opened his door and began to get out. At that point the Marines received several rounds of rifle fire that originated from somewhere behind claimants’ car. Concurrent with this development the driver slammed his door and the car accelerated violently in reverse in something of a careening movement. When this happened, the Marines opened fire on the car. They did this not on orders but as a reflex action to the almost simultaneous occurrence of the sniper fire directed at them and the violent movement of the car. It was this Marine gunfire, unquestionably tragic and, with the benefit of hindsight, unwarranted, that inflicted the injuries underlying the present reference.
It is undisputed that the specific provisions of the Federal Tort Claims Act, excluding from the Government’s waiver of immunity, assault and battery claims (other than for ac- *906 cidental discharge of a firearm) as well as claims arising m a foreign country,[4] deprive claimants of any legal basis for recovery within the meaning of that standard as contained in 28 TJ.'S.C. § 2509 (c).
Moreover, as already indicated, it must be concluded that claimants are without an “equitable” claim, as comprehended by the same provision.
It is well settled that “equity” as a test of governmental obligation in the context of congressional reference legislation conditions liability on the existence of some unjustified act or omission resulting in the injury for which redress is sought. B Amusement Co. v. United States, 148 Ct. Cl. 337, 342, 180 F. Supp. 386, 390 (1960); Webb v. United States, 192 Ct. Cl. 925, 932 (1970); Kochendorfer v. United States, 193 Ct. Cl. 1045, 1055 (1970). In short, the test has been stated in terms of whether the claim in question would be recoverable against a private party. Armiger v. United States, 168 Ct. Cl. 379, 384, 339 F.2d 625, 628 (1964). For present purposes, then, “equity” means that in the circumstances under consideration the Government would be legally liable but for one or more extra-meritorious defenses that accrue to it by virtue of its sovereign status. Though Burkhardt v. United States, 113 Ct. Cl. 658, 84 F. Supp. 553 (1949), includes some general language referring to an “equitable claim” as a nonjuridical concept founded on broad moral principles, the holding of the case is based squarely on a finding of fault that would have been redressable at law if perpetrated by a private party. Speaking of the claimants as downstream riparian owners whose property was damaged by an elevation of water level caused by the erection of an upstream Government dam, the court observed: “It must be conceded that had they [claimants] been so deprived of their property by private individuals not holding a dominant easement entitling them to raise the water level, they would have been entitled to compensatory damages for such taking in a court of law.” 113 Ct. Cl. at 668, 85 F. Supp. at 559.
Where, as here, the governmental act complained of is tor-tious in character, the twofold test of “equity” in the con *907 gressional reference sense has been stated in the following terms:
(1) Was the alleged “act or omission of * * * [the] employee of the Government * * * within the scope of his office or employment” ?
(2) If so, was that act or omission “negligent or wrongful” ? [Armiger, supra, 168 Ct. Cl. at 385, 339 F.2d at 628.]
Assessed by these standards, the evidence in the present record falls short of establishing an equitable claim under 28 U.S.C. § 2509(c).
The extreme tragedy of the consequences of the Marines’ acts cannot be permitted to obscure the merits of the question of whether those acts amounted to negligence. Though the trial commissioner seemed to find that the Marines were receiving sniper fire immediately prior to their opening fire on claimants’ car as it moved violently in reverse, he concluded that the Marines’ response would only have been reasonable if the incoming fire had emanated from the car.[5] Deliberating long after the fact and from the vantage point of a Washington courthouse, we are unable to impose such strict standards of acuity and selectivity on Marines on foreign soil, policing a civil insurrection frequently typified by sniper fire and destructive violence, who were being subjected to sniper bullets at the time. There must be a realistic recognition of the contextual climate. Brown v. United States, 256 U.S. 335, 343 (1921); Greenstone, Liability of Police Officers For Misuse of Their Weapons, 16 Clev.-Mar. L. Rev. 397 (1967). Given that recognition, it cannot responsibly he said that the Marines reacted unreasonably in opening fire on the car occupied by claimants.
Moreover, claimants’ own version of the facts leading up to the tragic shooting persuasively suggests that their own negligence contributed to the injury that followed. Thus, Mr. Burt candidly acknowledged, and the trial commissioner found[6] that he recognized the Marine sentry who halted the taxi as the same Marine with whom he had spoken at length the day before. With this awareness, Burt’s unexplained failure to call out and identify himself and Mr. Kennedy seems hardly excusable.
*908 Finally, it is far from clear that in pursuing their professions in the face of the known hazard of sniper activity, claimants did not assume the risk of personal injury, not only from rebel sniper fire but from any other action that such fire might precipitate in the atmosphere that prevailed.
Claimants knowingly placed themselves in a position of peril. Journeys into a no-man’s-land during a cease-fire in the circumstances of this case could reasonably be expected to involve the danger that an incident such as occurred could result.
As noted at the outset herein, the instant reference resolution was not limited to an analysis of claimants’ demands according to the criteria of 28 U.S.C. § 2509 (c). In terms, we are called upon, in addition, to determine whether in “good conscience” the claimants should be compensated.
We conclude that the supplementary criterion of “good conscience” invokes a standard far more liberal than those defining a “legal” or “equitable” claim. It is simply whether it can be reasonably said that the nation owes claimants a debt based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. Just as in United States v. Realty Co., 163 U.S. 427, 440 (1896), where the Court applied that broader standard to uphold Congress’ power to appropriate money for the payment of sugar bounties to persons who reasonably relied on their eligibility to receive them, even though the legislation authorizing the bounties may have been unconstitutional, there can be no question as to the sufficiency of the evidence in the present record to justify Congress’ awarding reasonable compensation to the claimants on the premise of broad moral considerations. Thus, it cannot be seriously questioned that claimants’ presence in the Dominican Republic to observe and report the events transpiring there was directly attributable to the encouragement and even the logistical support of our Government in its desire for complete coverage of the situation by independent news representatives. There is no reason to assume that without that governmental encouragement and support, claimants would have been able even to gain entry *909 into the Dominican Republic, to say nothing of being at the particular spot where tragedy befell them.
There remains a determination of the amount of compensation to be paid claimants under traditional juridical standards developed to measure damages in tort actions. These standards require, once the obligation of the United States is recognized, pecuniary compensation for actual injuries sustained, when shown with reasonable clarity, which are the direct, natural and proximate consequences of the actions by the United States.
Although claimants’ injuries were sustained on foreign soil, there are a number of reasons that make it appropriate to apply the principles of the law of damages that are accepted generally in the United States.
Traditionally, the measure of damages has been considered to be a procedural matter to be resolved by the law of the forum rather than by the law of the place where the injury occurred. Moreover, this case involves a proceeding against the United States that arises out of a foreign incident involving United States citizens, a proceeding whose nature is neither legal nor equitable in the normal sense. The obligation of the United States flows from considerations of good conscience and morality, not from any legal or equitable rights of an enforceable, juridical variety. As previously indicated, if private parties only were involved in the instant situation, claimants would have no substantive right to a recovery of any compensation at all. Finally, the U.S. Marines involved in this incident were not involved in “combatant activities” in the generally understood sense of engagement with an enemy, either in assault or in defense against attack. The military action involved in this case was to maintain a safety zone in a foreign country in connection with a ■local altercation in order to protect American lives and property.[7]
The death of Douglas E. Kennedy in Canada on November 10, 1971, has no bearing on the choice of law to be applied in the measurement of compensation. There is no evidence that Mr. Kennedy’s death was directly or indirectly caused *910 by the gunshot wounds 'he received in the Dominican Republic in 1965. Hospital records and other documents were offered by respondent on November 29,1971, in support of a proposed stipulation with regard to the cause of Mr. Kennedy’s terminal illness. Although the proposed stipulation was not accepted, the proof offered, which is relevant and admissible, would support the conclusion that, in fact, there was no causal connection between Douglas Kennedy’s gunshot wounds and his subsequent death.[8]
United States law provides no exact standard to measure damages in personal injury cases. The amount awarded is, in theory, to substitute a pecuniary compensation for the loss, suffering and injury sustained. Necessarily the particular facts and circumstances involved are controlling. Under generally accepted legal principles developed in the United States, claimants’ compensation for the injuries sustained on May 6,1965, should be determined from consideration of the following elements:
1. Impairment of earning ability, which includes lost time prior to trial and decision and probable lost time and decreased earnings capacity in the future. Where decreased earnings capacity is permanent, recovery is normally allowed on the basis of life expectancy prior to injury. When death occurs before trial from causes other than the injury, damages for impaired earnings capacity are limited to those sustained prior to death, and are not based on life expectancy prior to injury.[9]
2. Value of medical services made necessary as a result of the injuries, which includes incurred expense and probable expenditures in the future.
3. Pain and suffering, which consists of two separate but related elements. Although adequate definition is not readily accomplished, in general, pain is a sensation in the nervous system that results from initial physical impact, and its continuation in the future. Suffering is the apprehension or recognition of the distress of pain. Recovery may include compensation for the initial pain and suffering, subsequent pain and suffering incident to related surgery or other medical *911 treatment, and pain and suffering reasonably certain to be experienced in tbe future. Compensation for future pain and suffering is based upon probable life expectancy in the injured condition, and terminates at death. No fixed standard measures compensation for pain and suffering. In any given case, the amount that should be allowed for pain and suffering is the amount, in addition to other damage items, that in consideration of all the circumstances, is a reasonable allowance for the pain and suffering necessarily endured or to be endured. The amount should be fair, reasonable, and free from sentimental standards.
4. Miscellaneous elements eligible for consideration in fixing petitioners’ compensation may include increased costs of living or diminished purchasing power of money, and permanent interruption of career and enforced change of occupation.
Variations in the value of the claimants’ demands at various stages of this proceeding demonstrate the subjective differences and the difficulties in fixing compensation when pain and suffering necessarily is a major element. H.R. 9752 (90th Con., 1st Sess.), the original claim, sought an appropriation of $75,000 to compensate Douglas E. Kennedy, and $50,000 for Alvin V. Burt.[10] In this court, the petition seeks “not less than” $75,000 “plus those sums of interest, costs, and fees which in good conscience the United States Government *912 should bear” for Douglas E. Kennedy, and not less than $50,000, with similar additions, for Alvin V. Burt.[11] After trial, claimants requests $125,000 for Douglas Kennedy and $85,000 for Alvin Burt.[12] The trial commissioner, in his May 18, 1971 Opinion, concluded that “if permissible, Petitioner Kennedy should be awarded $100,000; and Petitioner Burt should be awarded $75,000.” The trial commissioner on March 24,1972, in his Supplemental Opinion “reiterated and reaffirmed in all respects” the recommendations to Congress contained in the original opinion. Claimants urged acceptance of the trial commissioner’s recommendation.
Amounts claimed in the original bill in Congress, or at various stages of the proceedings in congressional reference cases, under the enabling legislation, are not limitations on the amount, if any, of compensation that may be recommended by the trial commissioner or by the review panel, after consideration of all the facts and argument. The trial commissioner is directed to submit conclusions sufficient to inform Congress “* * * the amount, if any, legally or equitably due from the United States to the claimant.”[13] The review panel “* * * by majority vote, shall adopt or modify the findings or the conclusions of the trial commissioner.”[14] The review panel’s report is submitted to the Chief Commissioner for transmission to Congress for such disposition as may be appropriate.
The trial commissioner’s findings of fact relative to claimants’ proof of damages are set forth in findings 87 through 131 of his May 18,1971 Opinion, reproduced as Appendix A. We have applied these findings of fact, together with additional evidentiary materials cited above, in considering the various elements determinative of claimants’ compensable damages. Our conclusions derive from the following factors and analysis:
IMPAIRMENT OF EARNING ABILITY
Claimants’ employer, the Miami Herald, kept both of them on the payroll during their recuperation and guaranteed con- *913 tiiraing employment, provided that they work to the best of their ability. Claimant Burt left the Herald to undertake a newspaper venture in Georgia that was unsuccessful, and he returned to the Herald as an editorial writer. His salary at the time of trial was more than he received as Latin Amer-ican Affairs Editor. Claimant Kennedy returned to the Herald to his former position as chief photographer. Both received workmen’s compensation benefits during hospitalization. These benefits included lump sum payments of $2,200 for Mr. Burt and $6,700 for Mr. Kennedy.[15] Accordingly, neither claimant is eligible for compensation for lost time from his regular employment.
With respect to the element of decreased earnings capacity, both claimants experienced impairment of upward mobility in their careers and permanent changes in their occupations.[16] Mr. Kennedy’s eligibility for compensation in this regard is limited to the reasonable amounts lost during the 6.5-year period from the date of the accident to his death. One source of income lost was his capacity for “freelance” work, which prior to 1965 had amounted to $2,000 to $3,000 per year.[17]
Mr. Burt was 37 years of age at the time of the incident, and had a total life expectancy of 34.88 years.[18] His work-life expectancy to age 65 was 28 years. In addition to his newspaper employment, Mr. Burt had supplemental income from freelance writings of approximately $1,000 per year.[19] These earnings however admittedly were speculative.[20]
VALUE OF MEDICAL SERVICES
Both claimants received extensive medical treatment and care from United States facilities without charge. It is unquestioned that the medical services provided to claimants have been of the highest quality available and that they received excellent care after military treatment started in the field. No estimate of the total value of the medical services provided by the United States has been made. The extent of *914 those services is described in Appendix A, findings 104 (Dr. Hall), 107-108 (Mr. Burt), and 111-118 (Mr. Kennedy).
In addition to the services provided in United States facilities, workmen’s compensation benefits to claimants have included payments for medical care obtained from sources other than facilities of the United States.[21]
Claimants’ demands, other than for anticipated future expenses, do not include requests for the value of medical services. The costs of Mr. Kennedy’s terminal illness, from the evidence available, are not attributable to the gunshot wounds he received in 1965. Mr. Burt’s probable future medical expenses include an arthroplasty of his right hip, estimated to cost approximately $5,000 to $6,000, in addition to continuing doctor’s evaluations at least three times a year. Such evaluations are estimated to cost approximately $150 per year.[22]
PAIN AND STOTERING
Beyond question, the pain and suffering experienced initially by each claimant was severe. Even as ameliorated by the superior medical care and treatment, some pain and discomfort persisted and, with respect to Mr. Burt, will continue for the indefinite future. The intensity of the initial shock caused by the gunshot wounds, and claimants’ continuing disability and apprehension are fully detailed in the trial commissioner’s findings: Mr. Burt, findings 107-110, 120-122 and 128; Mr. Kennedy, findings 111-117, 119, 124-125, and 129 (Appendix A). Some of the facts relative to consideration of compensation for pain and suffering are summarized.
Each claimant received multiple wounds from machinegun fire. Mr. Kennedy, with hits in the head and left leg, was more seriously injured than Mr. Burt. Each had multiple metal fragments in their bodies from the bullets and from the automobile. Some of the fragments could not be removed safely. Each lost considerable quantities of blood, and each required multiple surgical procedures to repair damage to bone, nerves, and other tissues.
The initial firing period was extended and when it stopped there was a considerable time in which the wounded men were *915 apprehensive that the firing would start up again. First aid in the field was not immediately available and there was considerable delay in evacuation to a First Aid Station.[23]
After treatment at a First Aid Station, claimants were air evacuated to the hospital ship Raleigh. From the Raleigh, after extensive operations, they were transferred by air to Womack Army Hospital, Fort Bragg, North Carolina. Mr. Burt was discharged from Womack Army Hospital on June 15, 1965; Mr. Kennedy was transferred to Walter Heed Hospital on May 22, 1965, and was ultimately discharged from there on December 23, 1965. Mr. Burt returned to work part-time in August 1965; Mr. Kennedy returned to work in the summer of 1968.[24]
Mr. Kennedy underwent two operations on the Raleigh to remove metal fragments and to start repair of the sciatic nerve of his left leg. Because of a fractured femur, his leg was placed in a full spica cast. At Fort Bragg additional surgery was performed on the sciatic nerve. At Walter Need, two skin grafts and a sympathectomy to relieve pain were performed, treatment was received for a bleeding stress ulcer, and a full leg brace was fitted. After leaving Walter Keed he had continuous severe pain that could not be relieved.[25]
Mr. Burt underwent two operations on the Raleigh to remove metal fragments. During his six-week stay at Fort Bragg he had a second debridement, drainage and cast removal. He has 75 percent permanent disability of the right leg, and 30 percent disability to his body as a whole. He suffers severe pain after standing an hour, and unless relieved will suffer effects for several days. He must take pain-killing drugs daily.[26] Pain is expected to continue for the balance of his life.[27] Mr. Burt’s life expectancy from the date of this opinion, at age 44, is 28.67 years.
OTHER ELEMENTS
The purchasing power of the dollar for consumer prices, according to the Bureau of Labor Statistics, Department of Labor, for 1965, had a monthly average of $1.058; for 1970 *916 the monthly average was $0,860, a decline of $0.198.[28] The consumer price index was reported, by the Burean of Labor Statistics, for all items in 1965 at 94.5 and in 1970 at 116.8, an increase of 21.8 points.[29] In August 1972, fhe purchasing power of the dollar, for consumer prices, averaged $0.796, and the consumer price index, for all items, was 125.7.
Each claimant had his career interrupted and permanently altered. Each was forced to make changes in his occupation as a result of the injuries sustained on May 6, 1965.[30]

Recapitulation and, assignment of values

Douglas E. Kennedy:

(1) Pain and suffering from May 6,1965 to Nov. 10,1971_ $25, 000
(2) Physical disability from May 6,1965 to Nov. 10,1971- 20, 000
(3) Lost, earnings due to decreased earnings capacity (6.5
years at $2,500 per annum)- 16, 250
Total_ 61, 250
20% adjustment for inflation*- 12, 250
Total _ 73,500

Alvin Y. Burt:

(1) Pain and suffering from May 6,1965 to Aug. 31,1972_ 10,000
Future: at $250 per annum for 28.67 years- 7,168
(2) Physical disability from May 6,1965 to Aug. 31,1972_ 5,000
Future: at $200 per annum for 28.67 years_ 5, 734
(3) Future medical expenses_ 10,000
Total_ 37, 902
20% adjustment for inflation*_ 7, 580
Total_ 45, 482
«During period from May 6, 1965, to Aug. 1972.
CONCLUSION
For the reasons stated in the foregoing opinion, it is concluded that claimants have established that the United States has a moral obligation with respect to the claims in H.R. 9752, 90th Congress, 1st Sess. This obligation flows from considerations of sovereign honor and good conscience. Bevision of the referred bill (H.R. 9752) so as to provide *917 the sum of $73,500 for the Estate of Douglas E. Kennedy and the sum of $45,482 for Alvin V. Burt would discharge the aforesaid obligation of the United States and, therefore, would not constitute an outright gratuity unsupported by moral justification. See, Pope v. United States, 323 U.S. 1, 9-10 (1944).

 Claimant Kennedy died November 10, 1971. His widow and sole executrix, Eileen, has been duly substituted as claimant on decedent’s behalf. Any compensation to be paid to Douglas E. Kennedy will be for the benefit of his estate. In discussion herein, Kennedy will be referred to as the claimant.

 The record in this proceeding shows that claimant Burt’s middle initial is “V” rather than “B”.

 Claimants err In contending that this court’s Rule 147 (b) requires affirmance of a trial commissioner’s factual determinations unless they are found to be “clearly erroneous.” Cf. Rule 52(a), Fed. R. Civ. P. Though Rule 147(b) in terms accords presumptive correctness to the trial commissioner’s findings of fact, such findings will only be adopted on review if supported by a preponderance of the evidence. Hebah v. United States, 197 Ct. Cl. 729, 753, 456 F. 2d 696, 710, cert. denied, 409 U.S. 870 (1972) ; Willett v. United States, 186 Ct. Cl. 775, 785, 787-88, 406 F. 2d 1346, 1352-53 (1969) ; Miller v. United States, 168 Ct. Cl. 498, 501, 339 F. 2d 661, 662 (1964).

 28 U.S.C. § 2680(h) and (k).

 Appendix A, finding 84D.

 Id., finding 44.

 Id., findings 7 and 8.

 Claimants’ counsel In “Petitioners’ Memorandum in Opposition to the Government’s Application to Re-Open,” filed March 14, 1972, conceded: “The new fact, i.e., Kennedy’s death, means only this: Some six years after he was gunned down by the Marines’ machine guns, after his body, his health, and his career were ruined, he died of an unrelated cause.” (p. 5).

 22 Am. Jur. 2d Damages § 92 ; Rogers v. Thompson, 364 Mo. 605, 265 S.W. 2d 282, 289 (1954).

 These amounts were supported by the claimants at the Subcommittee hearing on February 8, 1968. Schedules submitted to the Subcommittee after the hearing allocated the claim as follows :
ALVIN V. BURT, JR.:
Earnings loss—
A. Freelance — $1,000 per year for 25 years.
B. Limitation to present position.
Permanent disability—
A. 15% Physical.
B. Mental.
Pain and suffering—
A. Continuing and permanent.
B. Future medical treatment (hip operation).
Total claim — $50,000.
douglas e. kennedx:
Earnings loss—
A. Freelance — $3,000 per year for 25 years.
B. Limitation to present position.
Permanent disability—
50% physical.
Pain and suffering—
A. Continuing and permanent.
B. Future medical treatment.
Total claim — $75,000.

 At trial, Mr. Burt testified In support of the amount sought In the petition and emphasized the pain and suffering element.

 Petitioners’ Proposed Findings of Fact, June 25, 1970, No. 19, p. 5; Petitioners’ Reply Brief to the Commissioner, September 25, 1970, p. 19.

 28 U.S.C. § 2509(c).

 28 U.S.C. § 2509(d).

 Appendix A, findings 103, 118 and 130.

 Id., finding 103.

 Tr., p. 158.

 Commissioner’s 1958 Standard Ordinary Mortality Table, 3 Am. Jur. Proof of Facts, Damages (1971 Supp.).

 Appendix A, finding 103.

 Tr.,p. 139.

 Appendix A, finding 130.

 Id., findings 104, 121.

 Id., findings 87 through 95.

 Id., finding 104.

 Id., finding 125.

 Id., finding 110.

 Id., finding 128.

 Statistical Abstract of the united States, 1971, Table No. 526, p. 332.

 Id., Table 534, p. 339.

 Appendix A, findings 103, 108, 117.