Laura **HEBAH**, Administratrix, In the Matter of the Estate of Robert Hebah, Deceased

v.

The **UNITED STATES**.

No. 325–69.

United States Court of Claims.

March 17, 1972.

Davis, J., dissented and filed an opinion in which Laramore and Durfee, Senior Judges, joined.

G. L. Spence, Casper, Wyo., attorney of record, for plaintiff; H. S. Harnsberger, Jr., Riverton, Wyo., of counsel.

John E. Lindskold, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for defendant.

Before COWEN, Chief Judge, LARAMORE and DURFEE, Senior Judges, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

In this extremely close case, we have concluded that plaintiff has not made a sufficient showing to convince us that we should disagree with the report of Trial Commissioner Joseph V. Colaianni, to whom this case was referred with directions to make findings of fact and recommendations for conclusions of law.

■ The commissioner filed his opinion and report on June 28, 1971, and plaintiff has taken no proper exceptions to the facts found by the commissioner, except for those based on a coroner's report. Under our rule, the commissioner's findings of fact are presumed to be correct because of his opportunity to hear the witnesses and to determine the weight to be accorded to their testimony. A party who undertakes to overcome this presumption must make a strong affirmative showing to the contrary. Wilson v. United States, 151 Ct.Cl. 271 (1960) and Davis v. United States, 164 Ct.Cl. 612 (1964).

■ Although the presumption does not extend to the conclusions of law made by the trial commissioner, he saw and heard the witnesses and had a much better opportunity than the court to familiarize himself with all of the circumstances involved. In the light of this situation and a consideration of the record, we find that under the peculiar facts and circumstances of this case, his conclusions are not unreasonable or unwarranted by the record.

Therefore, since the court agrees with the trial commissioner's opinion, findings of fact and recommended conclusion of law,* as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

COLAIANNI, Commissioner:

Plaintiff seeks to recover losses sustained by reason of the death of her husband on behalf of herself and the surviving children pursuant to the provisions of Article I of the Treaty of July 3, 1868, 15 Stat. 673.[1]

---

* The dissenting opinion of Davis, Judge, in which Laramore and Durfee, Senior Judges, join, follows the opinion of the trial commissioner which has been adopted by the court.

1. "*Article* I. From this day forward, peace between the parties to this treaty shall forever continue. The government of the United States desires peace, and its honor is hereby pledged to keep it. The Indians desire peace, and they hereby pledge their honor to maintain it.

"If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

"If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, on proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws; and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States. And the President, on advising with the Commissioner of Indian Affairs, shall prescribe such rules and regulations for ascertaining dam-

It is my opinion that plaintiff is not entitled to recover, and that judgment should be entered to that effect for reasons hereinafter discussed.

Plaintiff is the widow of Robert Hebah and administratrix of his estate. Plaintiff and her deceased husband were Shoshone Indians who lived together in a low-income apartment complex on the Wind River Indian Reservation, Fremont County, Wyoming.

Pursuant to the aforementioned treaty provisions, plaintiff had a proof of wrong-doing served upon the Superintendent of the Wind River Indian Reservation and the Commissioner of the Bureau of Indian Affairs in Washington, D. C.

This court has previously decided that the Treaty of 1868 gives plaintiff the right to sue as an individual, in her own behalf and that of her children. The court also decided that it had jurisdiction over the claim filed by plaintiff, and that Norman Moss, a member of the reservation police force, is included in the group "other people subject to the authority of the United States" mentioned in the Treaty of 1868.[2] Defendant attempts to relitigate these issues. To do so would do violence to the holdings of this court as well as to established judicial principles.

Because of the importance of events leading up to the killing of Mr. Hebah to a determination of the issues before the court, a discussion of the pertinent events culminating with the shooting will be reviewed.

The controversy arises from the death by shooting of plaintiff's husband by tribal policeman Norman Moss. Decedent returned to Apartment 18 at Tigee Village about midnight on March 13, 1968. He was drunk, angry and carrying a one pint bottle and a one-half pint bottle of whisky. Decedent had been released earlier in the day from a hospital in Casper, Wyoming, after spending some 2 days there for tests and observation. The exact nature of Mr. Hebah's medical problems was not established, but he had been complaining for some time of being in ill health.

Because of Mr. Hebah's drunken condition, Mrs. Hebah felt that this was not the best time to inquire about the hospital results. Instead she suggested that they all go to bed.

In addition to Mrs. Hebah, her pregnant daughter Cecelia Rose, her pregnant daughter-in-law Joyce, her son and grandson by a previous marriage, and her brother all intended to spend the night in the apartment. The grandson was sharing Mr. and Mrs. Hebah's bedroom, Cecelia Rose was occupying her own bedroom, and Mrs. Hebah's brother and son settled down for the evening in the living room.

Shortly after going to bed, Mr. Hebah started to choke Mrs. Hebah, and stated:

We are both sick, and we might as well get rid of our lives some easy way. * * * I am going to finish this, this time. * * *

Mrs. Hebah became frightened and, on the pretext of getting some medication, left the bedroom for the peace and safety of her daughter's bedroom. The absence of Mrs. Hebah apparently angered Mr. Hebah for he told the grandson who was sharing the bedroom to go and get her. However, the grandson was also frightened by Mr. Hebah, and he instead went to the living room and did not return.

Mr. Hebah, drunk, angered over being abandoned by his wife, and perhaps despondent over his health, got his .22 long rifle from the bedroom closet that he had, unbeknownst to his family, placed there. The family had, for reasons

---

ages under the provisions of this article as in his judgment may be proper. But no such damages shall be adjusted and paid until thoroughly examined and passed upon by the Commissioner of Indian Affairs, and no one sustaining loss while violating or because of his violating the provisions of this treaty or the laws of the United States shall be reimbursed therefor."

2. Hebah v. United States, 428 F.2d 1334, 192 Ct.Cl. 785 (1970).

which were not made clear, some time previously taken the rifle from Mr. Hebah and hidden it in the trunk of the family car. They thought it was still there. He noisily loaded the rifle. Startled, Mrs. Hebah, Cecelia Rose and the grandchild fled to the apartment of a neighbor. Mrs. Hebah explained to the neighbor: "He's mad at us, he's got a gun, and I'm scared to go back in the house." The neighbor understandably suggested that they remain at her apartment for a while. Mrs. Hebah then poured out the full extent of her concern that he might hurt somebody or kill himself. She went on and told the neighbor that she felt the police should be called to take the rifle away from Mr. Hebah and prevent either of these possibilities from occurring.

However, Mrs. Hebah did not call the police. Instead, after the passage of a few minutes she and her daughter decided to leave the grandchild at the apartment of the neighbor and to return to their apartment. Mrs. Hebah felt that it would be safe because she thought she had given Mr. Hebah adequate time to pass out from the consumption of the liquor he carried into the apartment. She was wrong.

After only a few minutes in Cecelia's bed, they heard Mr. Hebah get out of his bed and proceed to the living room. Hearing Mr. Hebah threaten Mrs. Hebah's brother and son by a previous marriage and kick her brother in the back, Mrs. Hebah did not pause to discuss the matter; she immediately got out of bed and fled to the neighbor's apartment once more. Mrs. Hebah's brother and son also left the apartment at this time. On the other hand, Cecelia Rose went into the living room and grappled with her father in an attempt to wrest the rifle from him. She was unsuccessful in her efforts because the rifle was strapped to her father's shoulder. Seeing her father's finger on the rifle trigger, Cecelia Rose gave up and ran from the apartment to join her mother.

Joyce Hebah also left the apartment. While it is unclear whether she left at the time of Mrs. Hebah's first or second departure, it is clear that because of Mr. Hebah's drunk and threatening mood, she made arrangements to sleep at her sister's-in-law apartment.

Both mother and daughter were now convinced of the necessity of police intervention, and they ran to the phone at the Tigee Village apartment office to call the tribal police. While on their way, they discussed the matter with a neighbor, who in turn agreed to place the call for them. The call was received at the Wind River Reservation police station by Hebah's son, Alvin, who by coincidence, had been arrested and was acting as jail trustee that evening. Alvin contacted Officer Norman Moss at his home to report the call and inform him of the necessity of his presence at Apartment 18 of Tigee Village.

Within 10 minutes after he received the call, by 1:15 a. m., Moss was at Tigee Village. He drove slowly around the U-shaped road which separated the two rows of facing apartments at the village in an attempt to find the disturbance that he was called to investigate. All was quiet, he saw no disturbance, heard no commotion. After circling the area another time without seeing anything, Moss was about to leave when he saw Mrs. Hebah and Cecelia Rose in the entrance way of the neighbor's apartment. He was told that they had called the police and needed help.

Mrs. Hebah explained to Officer Moss that her husband was drunk, armed with a rifle, had plenty of ammunition, that he had chased her brother and son out of the apartment, that he had threatened her with bodily harm, and that she and her daughter had fled from the apartment.

Undoubtedly Moss was impressed with the seriousness of the situation, for he immediately contacted Special Officer Harry Svela, the ranking officer on the tribal police force, for assistance.

Svela did not know what had occurred at Tigee Village or why he was needed. He arrived at approximately 1:30 a. m. Svela was told by Moss that Mr. Hebah

returned home at about midnight in a drunken and angry state, that he had since armed himself with a rifle, threatened members of his family, and drove them out of the apartment. Svela then talked to Mrs. Hebah and Cecelia Rose and confirmed the facts. Also Mrs. Hebah told him that she wanted to be able to reoccupy her apartment. Svela was concerned enough about the seriousness of the situation to call Chief of Tribal Police John Whiteman and Officer Charles Whiteman as reinforcements. As the ranking police officer on the Wind River Reservation, Special Officer Harry Svela was in charge and took control of the operation. Svela, in the meantime, asked that Mrs. Hebah and Cecelia Rose draw up a floor plan of the apartment, and that they particularly point out which room they felt Mr. Hebah would be occupying. They did so willingly.

Officer Charles Whiteman arrived at about 1:35 a. m. He was followed by Chief Whiteman at about 1:55 a. m., and was the last officer to arrive. By the time they arrived, Moss had gone to the rear of the Hebah apartment to keep the back door under surveillance in the event that Hebah, if he was still in the apartment, should try to use it. Svela remained to guard the locked front door. Upon the arrival of the Whitemans, Svela apprised them of the situation, particularly emphasizing that Hebah returned home at about midight drunk, had under threat of bodily harm driven his wife, daughter and various relatives from the apartment, and was now armed with a loaded rifle. They also reviewed the floor plan of the apartment, and discussed the room which Hebah in all probability was occupying.

From the time that Moss first arrived at the apartment, approximately 1:15 a. m., until the time that Chief Whiteman arrived, about 1:55 a. m., the Hebah apartment remained dark. Although Officer Moss, while guarding the rear door, did hear a muffled voice inside the Hebah apartment, on the whole all was quiet. Hebah had not caused a commotion or disturbance of any kind.

After being briefed, Charles Whiteman went to the back of the apartment to assist Moss. He, however, found that Moss had already entered the apartment, by way of the back door, and he proceeded inside the apartment after Moss. By this time, Moss had started to search the apartment and was about to open the door of the room that Hebah was thought to be occupying. Officer Whiteman knew which of the bedrooms Hebah might be occupying because he had gone over the floor plan with Svela. Moss, however, had been stationed at the rear of the apartment during the briefing and was therefore unaware of that information. During their search of the apartment, the officers turned on the lights in several of the rooms. Svela while stationed at the front of the apartment saw the lights come on, and went immediately to the rear of the apartment to investigate. Chief Whiteman remained at the front door of the apartment. Upon finding that Officers Moss and Whiteman had already entered the apartment, Svela joined them inside. The three officers completed a search of the Hebah apartment, with the exception of the bedroom which Mr. Hebah was thought to be occupying.

Norman Moss then opened the front door of the apartment and let Chief Whiteman in. Thereafter, Svela and Chief Whiteman flanked the closed bedroom door. Officer Whiteman positioned himself in the hall leading to the rear door of the apartment, and Officer Moss assumed a position at the junction of the kitchen and the living room, near the front door.

Svela unsuccessfully asked Mr. Hebah to come out of the bedroom to talk. Mr. Hebah responded by telling him that he would have to come in and get him. Also, Svela asked Hebah if he had a rifle, and Hebah replied that he would have to come in the bedroom to find out. Frustrated, Svela gave up.

Chief Whiteman took up where Svela left off and also tried to coax Hebah out

of the bedroom. Chief Whiteman even called Hebah by the nickname "Dry Meat," an appellation which both Hebah and the Chief jokingly called each other over the past few years. While the name did have connotations concerning one's sexual adequacy, Whiteman said he did not intend to be offensive, and indeed did not take offense when Hebah called him that name. There is no doubt that Hebah knew that he was being called by Chief John Whiteman of the Tribal Police for in response to at least one of the Chief's calls to come out and talk, he replied: "No John, come on in and get me."

In all, both Svela and the Chief tried for some 10 minutes to talk Hebah out of his bedroom. During the entire time the police officers were inside the apartment they did not tell Hebah what they wanted him for, that he was under arrest, or identify themselves. Nonetheless Hebah's calling of the Chief by his first name makes clear that he knew that the persons at his bedroom door were police officers.

Because of Mrs. Hebah's information concerning Mr. Hebah's drunken and armed condition, both Svela and Chief Whiteman were prepared to use tear gas, if it became necessary. The tear gas canister which Svela carried into the apartment was of the type that jumped around under its own power after going off, and emitted its gas from several openings in the container. The container also was clearly marked that it was to be used before 1958. Nothwithstanding this marking, Svela was hopeful that it would perform properly.

Svela, as the officer in charge, decided that he would handle the placement of the tear gas canister. Thus, feeling that it would be most effective if the gas discharged inside of the bedroom, Svela knelt to one side of the bedroom door and with one motion turned the door knob and pushed the door open. However, because of an obstruction, the door only opened about 6 to 8 inches. Almost simultaneously with the pushing open of the bedroom door, Svela attempt-

ed to throw the armed tear gas canister through the partially opened door, and Hebah fired a shot through the door. A splinter or other object flew past Svela's head. The tear gas canister struck the door jamb, rebounded, and went off. It appears, from the stains on the floor that in this instance the canister followed a 5-foot long and 1-foot wide path along one living room wall.

With the rebounding of the tear gas canister into the apartment area occupied by the policeman and Hebah's firing through the bedroom door, the four officers decided to evacuate the apartment. All of the officers heard the "pop" of the canister. Officer Whiteman even smelled the tear gas just before he went out the back door. Charles also claims, as does each of the officers, to hearing a second shot immediately following the "pop" of the tear gas canister. After leaving the apartment, Charles took up a position outside the rear door of the Hebah apartment. Charles did not during the entire incident draw his service revolver.

Chief Whiteman saw a white cloud of smoke rise from the canister as he was about to leave the apartment by way of the front door. The Chief ran out the front door and to his right. He momentarily went behind a solid cinder block abutment, situated about 8 feet from the front door, that ran the entire distance from the ground to the roof of the apartment. The abutment projected about 4 feet from the front wall of the apartment. None of the officers had drawn his service revolver while he was inside of the Hebah apartment trying to coax Hebah out of his bedroom. However, while he was still behind the abutment, Chief Whiteman, for the first time, drew his revolver.

Officer Moss ran through the front door of the apartment and to his left. He ran toward a solid concrete block abutment, about 8 feet from the front door, similar to the one behind which Chief Whiteman was positioned.

Moss went behind the abutment and for the first time since arriving at

Tigee Village drew his revolver. Moss then assumed a partially exposed position near the edge of the abutment, which enabled him to have an unobstructed view of the front door of the Hebah apartment.

Svela also ran from the apartment to his left and took up a position behind the abutment to the side of Moss. Svela likewise had a full view of the front door of the Hebah apartment. Similar to Moss and Chief Whiteman, Svela drew his revolver for the first time.

Because of the shot which Hebah fired through his bedroom door, and a second shot which Moss claims to have heard as he was going out the front door, Moss felt that Hebah would be coming out of the apartment with his rifle. Thus, Moss had his gun aimed at the front door. Of course, the officers could not be sure that Hebah would be coming out of the front door.

Very shortly, Svela estimated the time to be 5 or 10 seconds, after the officers had evacuated the apartment, Hebah appeared at the front door. This area was lighted by the apartment front door light. Hebah came out of the front door facing directly forward, with his rifle in his hands. Although he apparently was a left-handed shooter, he had the stock of the rifle in his right hand and the barrel in his left. The barrel was pointed generally upward and in the direction of Moss and Svela. None of the officers immediately fired at Hebah. Nor did any officer tell Hebah to drop his gun, tell him he was under arrest, or in any way try to communicate with him.

As Hebah came out the front door, he momentarily paused. Svela had Hebah in view and cautioned Moss to "Watch him, watch him." Hebah turned his head and eyes in the direction of where Svela and Moss were positioned and raised his hands and rifle. Moss assumed that Hebah had seen him, and was raising the rifle to a firing position. Therefore, before Hebah could get the rifle to his shoulder, Moss fired one shot. The bullet entered Mr. Hebah's left first rib and

perforated his right fourth rib and lodged near there.

After being hit, Hebah dropped the rifle at his feet, fell backward against the front of the apartment and slumped to the ground. Svela immediately ran to Hebah, picked up the rifle and placed it out of his reach.

All during this brief incident Chief Whiteman had been behind the abutment motioning to Charles to assume another position, so that he would not be in the Chief's line of fire if Hebah should leave the apartment by way of the rear door. Accordingly, Chief Whiteman did not see Hebah come out of the front door or witness the shooting. However, upon hearing the shot, Chief Whiteman turned his attention to the front door, and running toward Hebah he took possession of the rifle and locked it in his police car. A later investigation disclosed that the rifle was cocked for firing, a bullet was in its firing chamber, and eleven more bullets were in its magazine.

Officer Whiteman also heard the shot fired by Moss and ran to the front of the apartment to investigate. He was told that Hebah had been shot, and to go get his police car so that Hebah could be taken to receive medical attention. Hebah later died on the operating table as a result of the gunshot wound.

While Officers Whiteman, Svela and Moss were arranging for Hebah's medical attention, Chief Whiteman returned to Wind River Reservation jail. Some hours later, he was told of Hebah's death and given the assignment of informing Mrs. Hebah. Upon arrival at the Hebah apartment, Whiteman found Mrs. Hebah crying in her bedroom. She had already been told of her husband's death. Whiteman expressed his sympathy and was told by Mrs. Hebah that:

> Robert was sickly * * * he always wanted to shoot it out with a policeman and I think that's the way he wanted it * * *.

With these background facts in mind, it is appropriate to review the clause of the Treaty of July 3, 1868, 15 Stat. 673,

**704**

*supra,* which is relevant to this case. That clause provides: [3]

If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

While the clause contains a number of requisites which plaintiff has the burden of proving, the only ones which have not been previously established or admitted are, in plaintiff's own words: [4]

(1) Was Norman Moss a "bad man" in the sense of the treaty?

(2) Did he commit a wrong on the person of Robert Hebah, and *if both of the foregoing* are answered in the affirmative; then,

(3) What sum will "reimburse the injured person for the loss sustained?"

[Emphasis added.]

Since all of these treaty conditions have to be proved before plaintiff may recover, it follows that failure by plaintiff to prove any one of these conditions is fatal to her case. In my opinion, this case can be disposed of by focusing on the question of whether Officer Norman Moss committed a "wrong" upon Hebah within the meaning of the Treaty of July 3, 1868.

■■ Since the Treaty of 1868 does not define the term "wrong" as used in Article I thereof, other means must be used to ascertain the intended meaning of that term. In interpreting the meaning of treaties with the Indians, it has long been held that the language used "should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended

meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense." Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832). To the same effect Jones v. Meehan, 175 U.S. 1, 10–11, 20 S.Ct. 1, 44 L.Ed. 49 (1899); Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L. Ed. 340 (1908); Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912); Confederated Bands of Ute Indians v. United States, 330 U.S. 169, 179, 67 S.Ct. 650, 91 L.Ed. 823 (1947). Further, treaty interpretation is no different than interpretation of any other type of document, and since the Government drafted the treaty so as to express the understanding of an unlettered, illiterate, nondrafting party, any dispute as to meaning should be resolved against the drafter.

To establish the common or plain meaning of a word or term, this court has long accepted dictionary definitions. Webster's New International Dictionary (3rd ed. 1968) gives, among other definitions, the following definition for the noun "wrong": "Action or conduct which inflicts harm without due provocation or just cause; serious injury wantonly inflicted or undeservedly sustained; unjust or unmerited treatment * *."

■ To an Indian, and undoubtedly to all men, the killing of an Indian without just cause or reason would certainly be a wrong within the meaning of the Treaty of 1868. Accordingly, to determine if a wrong has been committed, it is necessary to establish if the killing of Hebah by Moss was justifiable and necessary under the circumstances of this case.

Plaintiff contends that any attempt to arrest deceased would be unlawful because no offense had been committed in the officers' presence, the officers had neither a warrant nor a signed complaint, and the officers did not identify themselves or tell deceased of the offense he was charged with. Therefore,

3. See n. 1.

4. See pp. 2–3 of Plaintiff's Requested Findings of Fact.

plaintiff asserts that the officers were mere trespassers in the Hebah apartment and that deceased had a right to use force upon them to protect himself. Plaintiff argues that deceased, despite provocative epithets, merely fired one warning shot inside his apartment, and came out after being tear-gassed, in response to an instinct for survival. Plaintiff urges further that the shooting of deceased by Moss was not an act of self-defense on Moss' part because under the circumstances herein, no reasonable man would have believed:

(1) that there was any real or apparent, imminent danger to himself; or

(2) that there were not reasonable alternatives to shooting to kill.

In addition, plaintiff suggests that Moss intended to kill deceased when he came out of the door because Moss was aiming his gun at the door, and he admitted he could have shot to wound deceased if he had wanted to do so. Accordingly, plaintiff concludes that the shooting of deceased was an unreasonable and unnecessary use of force by Moss under the circumstances, and, therefore, was a wrong within the meaning of the Treaty of 1868.

Defendant, on the other hand, contends that conditions precedent to recovery which allegedly are expressly set forth in the Treaty of 1868 have not been fulfilled. Defendant asserts that the plain language of the Treaty of 1868 makes the arrest and conviction of the wrongdoer a condition precedent to recover, and that Moss has never been arrested or convicted for any offense in connection with the shooting of deceased. Defendant also asserts that the plain language of the Treaty of 1868 requires that no reimbursement be made to one who sustains a loss while violating the laws of the United States, and that deceased was violating the laws of the United States when he suffered his "loss." Further, defendant argues that Moss committed no wrong upon deceased because the arrest attempt was lawfully made and, under the circumstances, the shooting of deceased was justified. Defendant suggests that the shooting of deceased was justified because he had challenged the officers to "come in and get" him, shot at the officers, and then appeared at the door with a rifle which he pointed in the direction of Moss and began to raise to his shoulder. Accordingly, defendant concludes that no wrong, within the meaning of the Treaty of 1868, was committed in connection with the shooting of deceased.

In order to determine if a "wrong" was committed by Moss, the more pertinent arguments of the parties will now be considered. Plaintiff and defendant have devoted considerable time, both at the trial and in their briefs and requested findings of fact, to the question of whether the tribal police were required to have a warrant or complaint in order to enter the apartment and to arrest Hebah. This, of course, requires a determination of whether the officers were, by their entry without a warrant, or signed complaint, mere trespassers or invitees.

In this instance there is no doubt that the police officers were called to the Hebah apartment by Mrs. Hebah. The officers were told that Hebah was drunk, armed with a loaded rifle, and that he had chased his wife and pregnant daughter from the apartment. The officers were also told by Mrs. Hebah that her brother, son and grandson, from a previous marriage, were chased from the apartment and forced to make other sleeping arrangements for the evening. Further, Mrs. Hebah, who alone signed the lease for the apartment, indicated to the officers that she and her daughter wanted to reenter and reoccupy the apartment. In fact, at the request of the officers, Mrs. Hebah and Cecelia drew a floor plan of the apartment, and even suggested which bedroom they felt Mr. Hebah would be occupying. Accordingly, there is no doubt that the officers entered the Hebah apartment as invitees of Mrs. Hebah. Thus, no warrant or signed complaint was needed by the officers to enter the apartment.

After entering the apartment as invitees of Mrs. Hebah, the acts of the tribal police in attempting to arrest Mr. Hebah, conformed to the procedures prescribed by reservation regulations. The requirements which members of the Indian police must adhere to in making arrests for certain defined offenses are defined by reservation regulations. Since the Wind River Reservation had, at the time of the shooting, an established and operative Court of Indian Offenses, the Chapter I regulation of the Code of Federal Regulations applied to the Wind River Reservation.[5]

With respect to the Court of Indian Offenses, 25 CFR § 11.2 (1968) provides in pertinent part that:

(a) A Court of Indian Offenses shall have jurisdiction over all offenses enumerated in §§ 11.38–11.87NH, when committed by any Indian, within the reservation or reservations for which the court is established * * *

(b) With respect to any of the offenses enumerated in §§ 11.38–11.87 NH, over which Federal or State courts may have lawful jurisdiction, the jurisdiction of the Court of Indian Offenses shall be concurrent and not exclusive. It shall be the duty of the said Court of Indian Offenses to order delivery to the proper authorities of the State or Federal Government or of any other tribe or reservation, for prosecution, any offender, there to be dealt with according to law or regulations authorized by law, where such authorities consent to exercise jurisdiction lawfully vested in them over the said offender.

(c) For the purpose of the enforcement of the regulations in this part, an Indian shall be deemed to be any person of Indian descent who is a member of any recognized Indian tribe now under Federal jurisdiction, and a "reservation" shall be taken to include all territory within reservation boundaries, including fee patented lands, roads, waters, bridges, and lands used for agency purposes.

*    *    *    *    *    *

With respect to arrests 25 CFR § 11.15 (1968) provides as follows:

No member of the Indian police shall arrest any person for any offense defined by §§ 11.38–11.87NH or by Federal law, except when such offense shall occur in the presence of the arresting officer or he shall have reasonable evidence that the person arrested has committed an offense or the officer shall have a warrant commanding him to apprehend such person.

■ Under this regulation, it is not necessary for an Indian police officer to have a warrant to arrest an Indian for offenses delineated therein, which occur in the officer's presence. At this point, it is appropriate to recall the words of Chief Justice Taft in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543 (1925), where he defined the phrase "in the presence of the arresting officer" to mean an offense which the officer becomes aware of or discovers by any means, rather than what he personally perceives. This is so regardless of his location relative to the alleged offense. In the recent case of Gaskins v. United States, D.C.App.No.5010 (March 6, 1970), 98 Daily Washington Law Reporter 489, it was held that an officer had probable cause to stop and search, without a warrant or signed complaint, three men on the street on the basis of information provided by a taxicab driver that one of the men had a gun. There the court found that the officer had grounds to reasonably believe that a violation of law had occurred by one of the men in question and the actions of the officer taken on that belief were reasonable.

Entry into the apartment to arrest Hebah was thus permissible even without a warrant or a signed complaint, by relevant reservation regulations which govern the actions of Tribal Police officers, if the offense which Hebah was accused

5. 25 C.F.R. § 11.1 (1968).

of committing occurred in the presence of the arresting officers, or they had reasonable evidence of its commission. Plaintiff correctly points out that from the time the police arrived, until they entered the apartment, about 40 minutes, there had been no commotion or disturbance, and the apartment was dark and quiet. Indeed, the officers were not at all certain that Mr. Hebah was in the apartment. Plaintiff further points out that the officers did not see Hebah commit or attempt to commit any offense prescribed by 25 CFR §§ 11.38–11.87 NH or by Federal law.[6] Plaintiff, thus, urges that entry by the tribal police into the Hebah apartment to arrest Mr. Hebah without a warrant was not only unjustified because no offense had occurred in their presence, but was without legal effect.

Plaintiff's position ignores the fact that 25 CFR § 11.15 does not require the police officers to have a warrant to make an arrest if the offense occurs in the presence of the police officers or if the police officers have reasonable evidence that the person arrested committed an offense. Moreover, plaintiff's position ignores the information provided by Mrs. Hebah to the officers who responded to her call for help, that Mr. Hebah was drunk, had driven all occupants, including Mrs. Hebah and her daughter, Cecelia Rose, from the apartment by threatening them with a rifle. Plaintiff further ignores that Mrs. Hebah called the police because she feared that her husband would hurt someone or even kill himself with the rifle. Plaintiff's position also ignores that Mrs. Hebah and her pregnant daughter wanted to reoccupy their apartment. Lastly, plaintiff ignores that Mrs. Hebah informed the officers that Mr. Hebah was drunk and had brought a full bottle of whisky and a one-half pint bottle of whisky into the apartment with him when he returned at about midnight.

The possession of whisky is a violation of 25 CFR § 11.55,[7] being in an intoxicated condition is a violation of 25 CFR § 11.49,[8] and assaulting a person is a violation of 25 CFR § 11.38.[9] Under 25 CFR §§ 11.304 and 11.305,[10] the officers were required to investigate these reported violations which Mrs. Hebah brought to their attention, and to prevent

6. 18 U.S.C. § 1153, as amended.

7. "Any Indian who shall possess, sell, trade, transport or manufacture any beer, ale, wine, whisky or any article whatsoever which produces alcoholic intoxication, shall be deemed guilty of an offense and upon conviction thereof shall be sentenced to labor for a period not to exceed 60 days."

8. "Any Indian who shall engage in fighting in a public place, disturb or annoy any public or religious assembly, or appear in a public or private place in an intoxicated and disorderly condition, or who shall engage in any other act of public indecency or immorality, shall be deemed guilty of disorderly conduct and upon conviction thereof shall be sentenced to labor for a period not to exceed 30 days."

9. "Any Indian who shall attempt or threaten bodily harm to another person through unlawful force or violence shall be deemed guilty of assault, and upon conviction thereof shall be sentenced to labor for a period not to exceed 5 days or shall be required to furnish a satisfactory bond to keep the peace."

10. 25 C.F.R. § 11.304 provides:
*    *    *    *    *
"(b) The duties of an Indian policeman shall be:
*    *    *    *    *
"(3) To report and investigate all violations of any law or regulation coming to his notice or reported for attention.
*    *    *    *    *
"(5) To inform himself as to the laws and regulations applicable to the jurisdiction where employed and as to the laws of arrest.
"(6) To prevent violations of the law and regulations.
*    *    *    *    *
"(10) To use no unnecessary force or violence in making an arrest, search, or seizure."
*    *    *    *    *
25 C.F.R. § 11.305 provides:
"The superintendent of any Indian reservation may remove any Indian policeman for any noncompliance with the duties and requirements as set out in § 11.304 or for neglect of duty."

these violations, if possible, Terry v. Ohio, 392 U.S. 1, 22–23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[11] Therefore, the information supplied by Mrs. Hebah to the officer was more than adequate to make the officer aware that proscribed offenses had occurred.[12]

Even if the foregoing facts were insufficient to constitute the commission of an offense in the presence of the tribal officers, such facts are sufficient to constitute "reasonable evidence" of the commission of offenses as required by 25 CFR § 11.15. Therefore, the officers did not need a warrant to enter the apartment or to arrest deceased and, in fact, were under a duty to enter the apartment to at least investigate reported offenses, if not to arrest deceased for such offenses.

Once in the apartment, the conduct of the police officers was also, on the whole, reasonable and proper. While it is perhaps true that more eloquent, patient, or tactful men than the officers in question might have persuaded deceased to come out of his bedroom without any incident, that does not necessarily render the conduct of the officers inside the apartment unreasonable or improper. The officers had a duty to at least talk to deceased. Although the officers did not tell deceased why they wanted to talk to him or who they were and deceased apparently did not see them, it would be preposterous to presume that Mr. Hebah did not know who they were or why they wanted to see him. In fact, the calling by Mr. Hebah of Chief Whiteman by his first name vitiates all arguments that Mr. Hebah did not know that the persons outside his door were police officers. It would be absurd to assume that Hebah did not know that his armed threats to do bodily harm to the occupants of the apart-

ment did not violate the Wind River Reservation laws of assault and/or disorderly conduct. Deceased also knew, from prior arrests, that drinking was a violation of the laws of the reservation.[13]

Deceased knew the officers well. That he might find, as plaintiff now alleges, the appellation "Dry Meat" offensive, and that he knew of abuses and mistreatment of prisoners by these officers does not warrant his refusal to come out of his bedroom peaceably to talk to the officers, even if he suspected they actually intended to abuse him. Had deceased been abused or mistreated by the officers after he came out of his bedroom, he could have sought appropriate redress, and I will not presume such endeavor would be futile. The facts known to the officers would justify their being virtually certain that deceased already knew their identity and they could presume that a formal announcement thereof would be a useless and unnecessary act.

The officers, thwarted in their attempts to persuade deceased to come out of his bedroom to talk and under a duty to investigate the matters brought to their attention by Mrs. Hebah, decided they had no alternative but to use tear gas to compel him to come out. The circumstances warranted the officers forcing an encounter with deceased not only in an effort to investigate the reasonable evidence that showed Hebah's violation of one or more Code of Indian Tribal Offenses, but also to prevent Mr. Hebah from injuring himself, or another with the loaded rifle. Tear gas normally is not permanently disabling or fatal, nor does it cause severe temporary injury. Indeed, the use of tear gas is a reasonable, humane and recognized means to compel a person to leave a place

11. Neither Federal nor State (Wyoming) law is applicable to the present case. The cases cited are not controlling, but are persuasive upon the decision here.

12. See Carroll v. United States, *supra*.

13. In fact, Mr. Hebah's threats against his wife may have violated the Court of Indian Offenses' February 11, 1966, Order that he "not go on the premises of Laura Hebah, while in an intoxicated or disorderly condition," or annoy, molest or disturb her. See also 25 C.F.R. § 11.73.

he wrongfully refuses to leave. Accordingly, in the present case, the use of tear gas was reasonable and proper.

Under the circumstances of this case, the shooting of Hebah was reasonable and necessary. When deceased appeared at the front door of his apartment with a rifle in his hands, he had already fired at least one shot in the direction of and in close proximity to the investigating officers. The officers had no way of determining whether the shot was fired in anger or in warning. The officers had been informed that deceased was drunk, and he probably was drunk. However the officers did not know for a certainty that he was drunk. Also, it is common knowledge that intoxication does not necessarily signify physical or mental prostration to the extent that a person is incapable of firing a rifle. In this instance, the officers expected from the quick succession of events, beginning with the almost simultaneous occurrence of the going off of the tear gas bomb, the firing of the shot through the door by Hebah, the evacuation of the apartment by the officers, and the alleged firing of a second shot by Hebah, that Hebah would come out of the apartment with his rifle. While the officers generally knew that a person who has been tear gassed has a tendency to put his hands to his eyes and rub them, they did not know for a certainty that deceased's exposure to tear gas was sufficient to incapacitate him. Moreover, even if deceased were blinded by tear gas to the extent he could not see well enough to shoot accurately at the officers, such condition does not mean that he was incapable of firing his rifle and possibly killing or wounding someone. The officers did not know whether deceased was left-handed or right-handed, or which way he shot, and, thus, had no way of knowing whether deceased was in a potential shooting position. Therefore, when deceased raised his hands, the officers did not, and could not, know whether he raised his hands to shoot at them or to rub his eyes because of the irritation from tear gas. Also one would not reasonably expect a person to rub his eyes with his hands while holding a rifle therein.

This was the situation confronting Moss, when deceased looked in his direction and began raising his arms. While killing either in self-defense or to effectuate an arrest is a last resort, an officer is not required to take unnecessary or undue risks in the performance of his duties, Terry v. Ohio, 392 U.S. 1, 23, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The standard by which an officer's conduct with respect to the use of deadly force is measured is whether he had grounds to reasonably believe that his life or the lives of others were in immediate danger of death or serious bodily harm, not whether a reasonably prudent man would so believe or whether he behaved as the ideal officer would have, Brown v. United States, 256 U.S. 335, 343, 41 S.Ct. 501, 502, 65 L.Ed. 961 (1921). And, as Justice Holmes said in Brown v. United States, *supra*, "Detached reflection cannot be demanded in the presence of an uplifted knife." In short, a police officer's actions are not to be judged from the remote vantage point of a library, but rather as circumstances appeared at the scene at the time in question, Jackson v. United States, 112 U.S.App.D.C. 260, 262, 302 F.2d 194, 196 (1962).

It is true, as plaintiff contends, that Moss had arrested deceased before this shooting, without incident. However, this cannot be used to show that Moss should have known that Hebah was a loud-mouthed but harmless individual. In the previous arrests by Moss, Hebah was not armed with a rifle, had not chased relatives and members of his own family from their apartment under fear of bodily harm or for their lives, and had not refused to talk to Moss or discharged a rifle in the presence of arresting officers.

Perhaps Moss or the other officers on the scene could have disarmed deceased without injury to themselves or others. However, Moss together with other officers were there investigating deceased's

conduct which involved the use or threatened use of deadly force, and deadly force, even if as a warning, had been directed at the officers by Mr. Hebah in the course of that investigation. The record certainly does not disclose that deceased was incapable of firing his rifle and of even wounding or killing someone. Indeed, it shows that Mr. Hebah was capable of, and did fire his rifle at least once that evening.

Under the circumstances herein, it is impossible to say that Moss did not have a reasonable belief that his life was in danger when Hebah turned his head and eyes in his direction and began to raise his hands and the rifle toward a possible shooting position. Accordingly, it was regrettable but reasonable for Moss to shoot to kill decedent. Having determined that the killing of deceased was reasonable under the circumstances herein, it follows that the killing was with reason or just cause. Therefore, Moss did not commit a wrong within the meaning of the Treaty of 1868.

Under the above stated view of this case, it is unnecessary for the court to decide whether or not Norman Moss was a "bad" man within the meaning of the Treaty of 1868. Accordingly, no decision is made as to whether Moss was such a man. Other subsidiary issues are raised and I have carefully considered each, but conclude that an extensive discussion is not warranted.

DAVIS, Judge (dissenting):

Without considering the propriety of any of the police actions before Moss shot Robert Hebah outside the apartment, I dissent because I am unable to agree with the trial commissioner's conclusion, adopted by the court, that "it was regrettable but reasonable for Moss to shoot to kill decedent" and "the killing of deceased was reasonable under the circumstances herein." Recognizing as I do that the trier-of-the-facts has the prime opportunity to observe the demeanor of the witnesses and appraise their credibility, I base my view squarely and largely on the testimony of Moss and the other police participants, accepting their evidence just as the trial commissioner did. I recognize, too, that we should not overturn a commissioner's findings unless there is strong reason. But we have also reiterated that the ultimate responsibility for finding the facts in this court rests on the judges, and if we are convinced that the preponderance of the evidence goes against the trier's determination our obligation is to say so. Bringwald v. United States, 334 F.2d 639, 643, 167 Ct.Cl. 341, 347 (1964); Miller v. United States, 339 F.2d 661, 662, 168 Ct.Cl. 498, 501 (1964); Willett v. United States, 406 F.2d 1346, 1353, 186 Ct.Cl. 775, 787–788 (1969). That is the posture in which I now find myself.

The first thing to note, in assessing the lawfulness of the shooting is that there is really no dispute as to federal law on excessive use of force by a police officer. Policemen have the right in case of a felony (Castle v. Lewis, 254 F. 917, 925 (C.A.8, 1918)):

to use such force as they then had reasonable cause to believe, and in exercise of their sound discretion they did honestly believe, was necessary to make the arrest, but in included the right to use no more, and the use of any greater force was beyond the scope of their authority, unauthorized, and without justification. Here, too, the measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary.

To the same effect, see Barrett v. United States, 62 App.D.C. 25, 64 F.2d 148, 149 (1933); Moran v. Lumbermen's Mutual Casualty Co., 92 F.Supp. 267, 270 (E.D.Mich., 1950). Under federal law, as generally under state statutes, it is sometimes put that an officer may use only such force as is "reasonably necessary" to make an arrest. People of State of Colorado v. Hutchinson, 9 F.2d 275, 276 (C.A.8, 1925); Bell v. United States, 182 U.S.App.D.C. 383, 254 F.2d 82, 85 (1958), cert. denied, 358 U.S. 885,

79 S.Ct. 126, 3 L.Ed.2d 113; Stinnett v. Commonwealth of Virginia, 55 F.2d 644, 645 (C.A.4, 1932). These are the interchangeable standards by which I measure Moss's conduct.

Several related factors convince me that Moss killed Hebah unnecessarily and without justification: (1) the total lack of warning after the deceased emerged from the house, together with the speed of the shooting; (2) Moss's relatively safe position behind an abutment; (3) the shooting to kill rather than merely to wound; (4) the unlikelihood that Hebah could and would have shot Moss at that precise moment; (5) the professional testimony of the other policemen that they had no thought of shooting; and (6) the brutal character of Moss as revealed by his reputation and previous history. All of these elements emerge clearly from the record, almost entirely through uncontroverted testimony.

After Hebah came from the house, there was no statement that he was under arrest, no warning to drop the gun after he was ferreted out by the tear gas (finding 51; Svela, T. 162–63; Chas. Whiteman, T. 770, Moss, T. 906). A warning would have been proper procedure once Hebah appeared on the threshold (Fishencord, T. 356; Oman, T. 311–12). When the senior officer present was asked if he considered shooting the deceased in the leg, he replied: "I didn't give it (sic) any consideration to shooting him at all." (Svela, T. 124). Another officer present did not even draw his gun (Chas. Whiteman, T. 758, 770) and admitted surprise that Hebah was shot (771). Hebah's exit from the house was not only anticipated, but was the intended result of the use of tear gas, especially after four or five seconds had elapsed. In response to a hypothetical question, policemen testified that the logical result of shooting tear gas at a man is almost instantaneous blindness and that the confused motion that Hebah made in his drunken condition may have been to raise his arms to rub his eyes (Svela, T. 162; Oman, T. 307; Ferris, T. 409; Moss, T. 918). Joyce Hebah testified that this was in fact the case (T. 970). Though Robert Hebah had raised his arms, his rifle was not in a position to fire (Moss, T. 912–13). The question, at its narrowest, then is whether Moss should have waited longer, if only for a moment, to ascertain what Hebah was going to do: surrender or talk or shoot.

Experienced officers, in response to hypothetical questions posed by defense counsel, indicated that proper police procedure would not dictate shooting if the officer were safely behind an abutment (Oman, T. 307; Ferris, T. 412). The senior officer present stated that Moss was behind a concrete abutment (Svela, T. 116, 120) and Moss so conceded on cross-examination.[1] (T. 899, 904). At the beginning of cross-examination, Moss contended that he was only partially covered but later, when confronted with his testimony from the coroner's inquest, he admitted that he was protected unless and until Hebah came around the abutment (T. 905, 907).[2] The abutment was at least six feet from the door, and along the wall on which the door was placed; when he emerged and when he was shot, Hebah was not facing toward Moss or the abutment but at right angles, though he had turned his head and eyes toward the abutment; Moss thus shot from a side angle and very quickly after the deceased came out of the door.

Moss' own testimony is damning: he never testified that he was in fear of his life; on the contrary, he left the abutment for the purpose of taking a clear

---

1. T. 899:

"Q. [Mr. Spence] And when you got out of the house, you got behind the abutment, didn't you?

"A. [Moss] Yes, about right here in a kneeling position."

2. Officer Svela, who "didn't give any consideration to shooting him [Hebah] at all", was also behind the abutment "slightly to the left of Norman Moss" (T. 123–24).

**712**

shot [3] (T. 899, 902, 904) and he intended to kill rather than wound, although he could have wounded Hebah, at such a short distance, if he so desired. (T. 917–18).[4] See also Svela, T. 162–63. As a generalization, if justification exists to shoot, it exists to kill. The reason is that officers should not hesitate to shoot a fleeing felon, for example, with the apprehension that, if their aim is sure and the man is wounded, well and good, but if aim is faulty and the felon is killed, they act at their peril. In our case, on the other hand, we have a stationary target, a drunken man, tear-gassed, a few feet away but apparently not yet ready to shoot. Moss was not matched one-to-one against the man he was trying to arrest; rather, four armed officers of greater size, surrounded the decedent on all sides. Nor are we faced with the problem of holding an officer accountable for a good faith error in his aim, but rather for his avowed intention to shoot to kill though he knew he could have wounded. What Moss said on the stand admits that, in this case, death was not a last resort.

Moss' deliberate decision, while behind the abutment, to shoot to kill is explainable, though not condonable, from his character as revealed by this record. The trial commissioner succinctly states: "The character testimony as to Norman Moss' general reputation as an officer was, without exception, that it was bad." (finding 22). His application for government employment admits several arrests, almost all of which resulted from intoxication: on two occasions, fines were imposed for reckless driving; three times for driving without a license; on two occasions, for disturbing the peace or disorderly conduct. (finding 20). Since he had not been convicted of a felony for a year previous to his application, he was hired, but in 1967 further trouble led to a temporary suspension without pay. He was observed by the Chief of Police in an intoxicated condition while on duty (in violation of 25 C.F.R. 11.304(8)) and was charged with beating, shooting tear gas, firing a revolver, and otherwise using unnecessary force or violence on an Indian juvenile and his companions (in violation of 25 C.F.R. 11.304(10)).

Witness after witness—Indians, Indian police officers, and white citizens—testified to Moss' affinity for shooting tear gas, his drunkenness, and his brutality. One Indian, formerly a trustee in a jail, reported that Moss beat and shot with tear gas a helpless drunk. (J. Armajo, T. 225–233). This testimony was corroborated by the victim of the beating (Groesbeck, T. 246, 250–52) and the investigating officer (Svela, T. 58–59). Moss even expelled tear gas in a closed car in which his wife and children were riding (J. Armajo, T. 241). A white state senator testified that Moss was not above aiming tear gas at a crippled and completely helpless Indian (Svilar, T. 516). The episode of beating and shooting tear gas which resulted in Moss' suspension also led to an assault and battery charge. The incident was substantiated by testimony from one of the Indian victims (Smith, T. 170–183), the former chief of reservation police (Fishencord, T. 338–39), and the assistant chief of reservation police (Ferris, 413–16). Both of these superiors described Moss as a "hot-head" (Fishencord, T. 369; Ferris, T. 411) and la-

3. T. 904:
"A. I was behind the abutment, then I moved back out again * * *
"Q. Did you testify, [at the coroner's inquest], 'I went in behind that abutment and pulled my revolver out?'
"A. For a short time, I did.
"Q. Than (sic) why did you come back out again?
"A. So I would get a better shot."

4. T. 917–18:
"Q. Could you have hit him in the leg from that distance while he was standing there looking around?
"A. I wasn't going to wound him.
"Q. Well, I know you weren't going to wound him, but I am saying could you have hit him in the leg if you had wanted to?
"A. If I wanted to, I suppose I could have shot him in the leg."

belled his reputation as "bad" (412), a judgment joined in by one of the Indian guidance counsellors (Trosper, T. 263). It is not surprising that Laura Hebah (626), her son (583), and daughter-in-law (605) also testified as to Robert Hebah's fear of being beaten and gassed by Moss. The white lawyer who represented Moss summed it up: "he was clothed subtly with a badge and he used this power, like I said, almost in a sadistic fashion" (Sen. Svilar, T. 526).

This is the policeman whose conduct we must evaluate, not some theoretical model of a careful and reasonable officer. There is, understandably, considerable reluctance on the part of courts to reflect adversely on the actions of an officer in making an arrest except where the departure from the norm is egregious. This mirrors a recognition both of the degree of danger policemen face regularly in performing their tasks and of the difficulties of split-second decision-making as to the amount of force that may be necessary. Events of the past decade, however, have forced into the public consciousness the sorry fact that there are some law enforcers who are not careful and reasonable, and do not try in good faith to do their best. I believe that this is one such instance. The record demonstrates that Moss should not have been allowed to remain an officer, and that on this occasion he acted, not as a police officer should, but as his own sadistic feelings prompted.

Since the court agrees with the commissioner that the killing was justified, it does not have to decide whether Moss was a "bad man" within the meaning of the treaty. However, I am sure that, had the commissioner and the court come to my conclusion as to Moss' use of excessive force, they would have no doubt as to the aptness of that characterization. The commissioner, as I have noted, found: "The character testimony as to Norman Moss' general reputation as an officer was, without exception, that it was bad" (finding 22), and I have already set forth the evidence showing his brutality, irresponsibility, and lack of

proper qualities. The record compels the finding that, even before the death of Mr. Hebah, Moss was a "bad man", and the events of that night reinforce the appellation.

I would hold that plaintiff is entitled to recover and return the case to the trial commissioner to ascertain the amount of recovery.

LARAMORE and DURFEE, Senior Judges, join in the foregoing dissenting opinion.